**Paul C. Galm, OSB No. 002600**
paul@paulgalmlaw.com
PAUL GALM, ATTORNEY AT LAW, LLC
12220 SW First Street
Beaverton, OR 97005
Phone:      (503) 644-9000
Fax:        (503) 644-9050

**John Devlin, OSB No. 042690**
john@johndevlinlaw.com
DEVLIN LAW, P.C.
434 NW 19th Avenue
Portland, OR 97209
Phone:      (503) 228-3015
Fax:        (503) 660-4079

**Josh Lamborn, OSB No. 973090**
jpl@pdxinjury.com
THE LAW OFFICE OF JOSH LAMBORN, P.C.
50 SW Pine Street, Suite 301
Portland, OR 97201
Phone:      (503) 546-0461
Fax:        (503) 914-1507

Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| DEREK JOHNSON, personal representative for the Estate of Rocky Stewart, Deceased,<br><br>Plaintiffs,<br>v.<br><br>WELLPATH, LLC, a Delaware corporation; CORRECT CARE SOLUTIONS, LLC, a Kansas corporation; COOS COUNTY, an Oregon county; PATRICIA SAUERBRY, an individual; DANIEL RYMER, an individual; MARK MAHLUM, an individual; ROBERT KRAMER, an individual; JIMMY LAY, an individual; SAMUEL ELEY, an individual; and JOHN DOES 1-9,<br><br>Defendants. | Civil Action No. 6:19-cv-01883-AA<br><br>**PLAINTIFF'S MOTION FOR SANCTIONS**<br><br>**AUTHORIZED TO BE FILED UNDER SEAL**<br><br>**ORAL ARGUMENT REQUESTED** |

## **TABLE OF CONTENTS**

MOTION………………………………………………………………..…………….5

FACTUAL BACKGROUND…………………………………………………..………5

    A.  Rocky Stewart's Death And Subsequent Investigations……………………..…….5

    B.  Wellpath's First Email Purge…………………………………………………...…8

    C.  Wellpath Fails To Place A Legal Hold On Emails Before The Purge…………..…13

    D.  Rocky Stewart's Estate Files This Lawsuit…………………………………..…15

    E.  Wellpath's Second Email Purge………………………………………………….15

    F.  Wellpath Gets Sanctioned And Pauses Its Email Purge Policy……………….....16

    G.  Plaintiff Attempts To Get Emails From The Wellpath Defendants……………..…18

    H.  Wellpath Repeatedly Fails To Disclose The Email Purges………………………21

ARGUMENT………………………………………………………………………….38

    A.  The Court Should Sanction Wellpath For Its Failure to Preserve Emails…………38

    B.  The Court Should Find That Wellpath Acted Intentionally…………………..…47

    C.  The Court Should Enter A Default Judgment Against
       The Wellpath Defendants…………………………………......................…..57

    D.  The Court Also Has Inherent Authority To Sanction Wellpath……………...…64

CONCLUSION………………………………………………………………….…...65

## <u>TABLE OF AUTHORITIES</u>

### Cases

<u>Apple Inc. v. Samsung Electronics Co.</u>, 888 F. Supp. 2d 976 (N.D. Cal. 2012)……...39, 43

<u>In re Bane</u>, 2010 WL 6451886 (9th Cir. B.A.P. Jan. 15, 2020)……………………………50

<u>Estate of Blodgett v. Correct Care Solutions, LLC</u>, 2019 WL 6528109
(D. Colo. Dec. 12, 2018)……………………………………………………………………47

<u>Brill v. Correct Care Solutions</u>, 286 F. Supp. 3d 1210 (D. Colo. 2018)……………..…55

<u>Brogdon v. Correct Care Solutions</u>, Case No. 1:16-cv-12 (W.D. Pa. May 9, 2017)…….55

<u>Connecticut General Life Ins. Co v. New Images of Beverly Hills</u>,
482 F.3d 1091 (9th Cir .2007)…………………………………………………...…57, 62

<u>Cooper v. City of Ashland</u>, 871 F.2d 104 (9th Cir. 1989)…………………………………43

<u>Early v. State of Arizona</u>, Case No. CV 16-00031-PHX-SPL (D. Ariz. May 22, 2018)…..55

<u>Herriges v. County of Macomb</u>, 2020 WL 4726930 (E.D. Mich. Aug. 14, 2020)……...…46

<u>Estate of Hill v. Naphcare, Inc.</u>, 2022 WL 1464830
(E.D. Wash. May 9, 2022)……………………………………………...…39, 48, 57, 59, 61

<u>Leon v. IDX Systems Corp.</u>, 464 F.3d 951 (9th Cir. 2006)…………………………...…passim

<u>Marziale v. Correct Care Solutions, LLC</u>, 2021 WL 1423277
(E.D. Ark. Jan. 27, 2021)……………………………………..………………………..55

<u>Marziale v. Correct Care Solutions, LLC</u>, 2020 WL 13421180
(E.D. Ark. Sep. 23, 2020)…………………………………………………….…………..46

<u>Marziale v. Correct Care Solutions, LLC</u>, 2020 WL 4744859
(E.D. Ark. July 28, 2020)……………………………………………….…..33, 50, 55

<u>Estate of Moreno v. Correctional Healthcare Companies, Inc.</u>,
2020 WL 5740265 (E.D. Wash. June 1, 2020)…………………………………..…..passim

Nall v. Correct Care Solutions, LLC, 2020 WL 4597288
(W.D. Wash. Aug. 11, 2020)…………………………………………………………..50

National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639 (1976)…62, 64

OmniGen Research v. Yongqiang Wang, 321 F.R.D. 367 (D. Or. 2017)…..……38, 59, 64

Paris v. Conmed Healthcare Management, 2017 WL 7310079 (D. Or. Nov. 28, 2017)…47

Rembert v. Cheverko, 2015 WL 5918185 (S.D.N.Y. Oct. 9, 2015)………………………55

Rose v. Rinaldi, 654 F.2d 546 (9th Cir. 1981)………………………………….…….43

**Statues and Rules**

45 CFR § 316(b)(2)………………………………………………………………43

Fed. R. Civ. P. 37……………………………………………………….………passim

OAR 166-150-0135…………………………………………………………....43

OAR 166-150-0200…………………………………………………………43

OAR 333-505-0050…………………………………………………………43

## MOTION

Pursuant to Local Rule 7-1, plaintiff's counsel and counsel for the Wellpath defendants[1] have conferred in good faith but have not been able to resolve this dispute.

Pursuant to FRCP 37(e)(2)(c), plaintiff moves this Court for a default judgment against the Wellpath defendants. As set forth below, the Wellpath defendants deliberately deleted emails, with the intent to deprive plaintiffs of those emails in litigation. The Chief Legal Officer of Wellpath oversaw this nationwide email purge. The Wellpath defendants did not disclose the purge for more than a year while discussing email discovery with plaintiff's counsel and the Court. This behavior is consistent with Wellpath's handling of other issues in this case and in cases across the country. Entry of a default judgment is the appropriate sanction for this misconduct.

## FACTUAL BACKGROUND

### A.      Rocky Stewart's Death And Subsequent Investigations

At approximately 8:22 p.m. on December 2, 2017, Rocky Stewart was booked into the Coos County Jail. Registered nurse Patricia Sauerbry was the only Wellpath employee on duty until midnight. She did not perform an intake medical screening of Mr. Stewart before leaving the jail.[2] According to the contract between Coos County and Wellpath, a Wellpath nurse is supposed to perform the intake medical screening "as soon as possible"

---

[1] The "Wellpath defendants" are Wellpath, LLC; Correct Care Solutions, LLC; and Patricia Sauerbry. Wellpath was formed in November 2018 as a result of a merger between Correct Care Solutions and another company. See Complaint, ¶ 5 (Exhibit 1 to Declaration of John Devlin In Support of Plaintiff's Motion for Sanctions ("Devlin Decl.")).

[2] There was no medical coverage for the graveyard shift, so Ms. Sauerbry knew that there would be no medical person in the jail until the day shift the next morning.

after a person is booked into the jail.[3]  There is a fact dispute about whether one or more Coos County jail deputies told Ms. Sauerbry that Mr. Stewart was vomiting, which would have been another reason for Ms. Sauerbry to see him before she went home.[4]

Nine hours after his booking, at approximately 5:30 a.m. on December 3, 2017, Mr. Stewart was found dead in his cell.[5]  The Oregon State Police responded to the jail that morning and interviewed numerous witnesses.  Ms. Sauerbry told them that no one informed her that Mr. Stewart had been booked into the jail or that he had been throwing up.[6]

Kathleen Weaver is a registered nurse who worked for Wellpath as the Health Services Administrator ("HSA") at the Coos County Jail.  Ms. Weaver was Ms. Sauerbry's supervisor.  On December 14, 2017, several Wellpath employees (including Ms. Weaver) participated in two meetings related to Mr. Stewart's death – a conference call with Coos County Sheriff's Office leadership and a conference call with only Wellpath employees.[7]

On January 3, 2018, Ms. Weaver attended a Mortality & Morbidity Review ("M&M Review") meeting related to Mr. Stewart's death.  The other attendees at the meeting were Andrew Walter (Wellpath Regional Vice President), Rachel Hemphill (Wellpath Regional

---

[3] See County 000042 (Ex. 2 to Devlin Decl.).

[4] See RSTE CCS 0627-0629 (CCS Nursing Documentation Pathway for Gastrointestinal Complaints) (Ex. 3 to Devlin Decl.).

[5] The State Medical Examiner ruled that Mr. Stewart died of severe atherosclerotic heart disease.  Plaintiff alleges that this condition is treatable with medication or surgery.  See Complaint, ¶¶ 73, 75 (Ex. 1 to Devlin Decl.).

[6] Coos County Deputy Mark Mahlum told the OSP detectives that he informed Ms. Sauerbry that Mr. Stewart had been throwing up.  See Devlin Decl., ¶ 4.  Coos County Deputy Cody Libbett documented that Deputy Mahlum gave this information to Ms. Sauerbry and testified that he witnessed the conversation between Deputy Mahlum and Ms. Sauerbry.  See Libbett Dep. at 47-48, 61-63 (Ex. 4 to Devlin Decl.); see also County 000270-271 (Ex. 5 to Devlin Decl.).

[7] See RSTE CCS 1319 (Ex. 6 to Devlin Decl.); see also RSTE CCS 1320 (Ex. 7 to Devlin Decl.).

Manager), Dr. Vivek Shah (Wellpath Regional Medical Director), Craig Zanni (Coos County Sheriff), Darius Mede (Coos County Jail Commander), and Eric Zanni (Coos County Sergeant).[8]  M&M Reviews are part of Wellpath's process of reviewing in-custody deaths.[9]

On March 8, 2018, counsel for Mr. Stewart's family sent an evidence preservation letter to counsel for Coos County and counsel for Wellpath.[10]  Wellpath has admitted that its counsel received this letter.[11]

On April 19, 2018, Wellpath's claims department opened up a claim related to Mr. Stewart's death.[12]  Wellpath did not place a legal hold[13] on any email boxes in connection with this claim.[14]

On May 31, 2018, counsel for Mr. Stewart's family sent a tort claim notice to Coos County and to Wellpath.[15]  The notice stated that "a claim for damages will be made against Correct Care Solutions [now Wellpath], as well as any employees of Correct Care Solutions who caused damage to, or the death of, Mr. Stewart."  Wellpath has admitted that it received this tort claim notice.[16]  Wellpath did not place a legal hold on any email

---

[8] See RSTE CCS 1289-1292 (Ex. 8 to Devlin Decl.).
[9] See RSTE CCS 0529-0534 (Ex. 9 to Devlin Decl.).
[10] See March 8, 2018 letter from John Devlin to Lindsey Hughes, et al. (Ex. 10 to Devlin Decl.).
[11] See Defendant Wellpath, LLC and Correct Care Solutions, LLC's Response to Plaintiff's Supplemental Requests for Admissions, RFA No. 27 (Ex. 11 to Devlin Decl.).
[12] See RSTE CCS 11516 (Ex. 12 to Devlin Decl.).
[13] The terms "legal hold" and "litigation hold" are used interchangeably throughout this brief and in the referenced documents and testimony.
[14] Wellpath's Electronic Data Retention policy stated: "[Wellpath] may at times become subject to a duty to preserve (or halt the destruction of) documents once litigation, an audit or a government investigation is reasonably anticipated."  See RSTE CCS 11474 (Ex. 13 to Devlin Decl.).
[15] See May 31, 2018 letter from John Devlin to Correct Care Solutions, LLC, et al. (Ex. 14 to Devlin Decl.).
[16] See Response to RFA No. 28 (Ex. 11 to Devlin Decl.).

boxes in response to the tort claim notice.

On June 20, 2018, counsel for Mr. Stewart's family sent a request to Wellpath for "all documents in your possession, custody or control related to Mr. Stewart."[17] On August 30, 2018, an attorney from the Lewis Brisbois firm responded: "Our office represents Correct Care Solutions. We are in receipt of your letter dated June 20, 2018 regarding Rocky Stewart. Correct Care Solutions has no documents related to Mr. Stewart."[18] In fact, Wellpath had documents related to the M&M Review of Mr. Stewart's death.[19] Those documents were prepared by Ms. Weaver and Dr. Shah.

### B.    Wellpath's First Email Purge

On March 8, 2019, David Perry, the Executive Vice President and Chief Legal Officer of Wellpath, announced in a company-wide email that the Wellpath IT department would be "implementing changes to the Company-Wide Email system in the coming days that are required to comply with Wellpath's Electronic Data Retention Policy."[20] Mr. Perry described that policy, which included the following elements:

- "Messages in the '**Inbox**' and 'Sent Items' folder will be retained for **1 year** from the time they were received, and then permanently deleted."

- "Messages in the '**Deleted Items**' folder will be retained for **180 days** from the time they were originally received, and then permanently deleted."

- "Messages stored in folders under '**Extended Retention**' will be retained for **5 years** from the time they were received, and then permanently deleted."

---

[17] See June 20, 2018 letter from John Devlin to Correct Care Solutions, LLC, et al. (Ex. 15 to Devlin Decl.).
[18] See August 30, 2018 letter from Eric Neiman to John Devlin (Ex. 16 to Devlin Decl.).
[19] See RSTE CCS 1289-1292 (Ex. 8 to Devlin Decl.); see also WELLPATH_STEWART_014857 (Ex. 17 to Devlin Decl.).
[20] See RSTE CCS 11478 (Ex. 18 to Devlin Decl.).

- ■ "Emails put on legal hold by the corporate legal department are retained until the legal hold is reviewed."

- ■ "Once permanently deleted it is not possible to recover the email. There are no backups or recovery options."[21]

Kathleen Weaver responded to Mr. Perry that same day. She wrote: "Thank you for the update. Quick question – so we are not to delete anything in our email? I am not sure I have enough room in my system to hold emails for a year."[22] Mr. Perry routed this email to the Wellpath IT helpdesk.[23]

A Wellpath Request for Change document noted that "[t]his change will cause aged email that falls outside the retention periods to be permanently deleted. Aged email present in email backups and archives will also be permanently deleted. * * * This change will impact results for eDiscovery if the mailbox is NOT on Legal Hold such as with internal employee investigations."[24] In addition to the changes noted above for then-current employees, Wellpath also permanently deleted the email accounts and backups of every former employee one year after the employee's departure, if that former employee's email box was not placed on legal hold.[25]

Robert Martin, Wellpath's Chief Information Officer, testified in a December 2019 deposition that "the plan was reviewed by Mr. Perry. It was approved by myself. It was reviewed with the CEO and the executive team of the company before we agreed to move

---

[21] See id.
[22] See RSTE CCS 15508-15509 (Ex. 19 to Devlin Decl.).
[23] See id.
[24] See RSTE CCS 11541-11542 (Ex. 20 to Devlin Decl.).
[25] See Martin Dep. at 47-48 (Ex. 21 to Devlin Decl.); see also RSTE CCS 11540 (Ex. 22 to Devlin Decl.).

forward with it."[26]  The idea for this plan appears to have originated with Mr. Perry, who emailed Mr. Martin in 2015 about implementing an email "purge" of "retained electronic mail that is older than one year."[27]  These senior Wellpath executives – the Chief Legal Officer and the Chief Information Officer – both referred to this process as "the purge."[28]

There is no question that Mr. Perry and the other Wellpath decisionmakers understood the consequences of this policy.  In fact, Mr. Perry took steps to exempt himself from the policy because "I use Outlook folders as my filing system and will need some things to be retained for more than five years."[29]  When an IT person suggested that the five-year cut off for extended retention could be changed to "another value," Mr. Perry responded: "Can you change it for just me or would you have to change it for everyone?"[30] The IT staff person responded that "[w]e can exempt you from this 5 year retention period on your 'extended retention' folder."[31]

Mr. Martin testified that the email purge was completed in May 2019.[32]  He estimated that Wellpath destroyed "millions" of emails as part of this process.[33]  He said that the implementation of the purge "ended up taking months to do because of the large size of the data store."[34]

---

[26] See Martin Dep. at 104 (Ex. 21 to Devlin Decl.).
[27] See RSTE CCS 15442-15443 (Ex. 23 to Devlin Decl.).  Mr. Perry joined Wellpath just three months earlier – in August 2015 – so this email purge was one of his first initiatives.  He left Wellpath in November 2020 – three months after he paused the purge.  See Ex. 24 to Devlin Decl.
[28] See RSTE CCS 15442-15443 (Ex. 23 to Devlin Decl.).  Wellpath does not use this term in any of its discussions about the policy outside the company.  To outsiders, Wellpath refers to this as a data retention or preservation policy.
[29] See RSTE CCS 15482-15485 (Ex. 25 to Devlin Decl.).
[30] See id.
[31] See id.
[32] See Martin Dep. at 58 (Ex. 21 to Devlin Decl.).
[33] See id. at 59.
[34] See id. at 106.

Before implementing this purge, Wellpath did not routinely delete emails. Richard Strickland, a Wellpath IT Security Manager, stated in a November 2019 declaration: "Prior to February 2019, emails dating back several years were stored in our Email System or Commvault backups."[35]  Mr. Martin testified as follows:

> Q:     Prior to the beginning of 2019, were all emails retained?
>
> A:     Yes
>
> Q:     After the beginning of 2019 were some emails retained and other emails were destroyed?
>
> A:     Yes
>
> *****
>
> Q:     All right. So let me parrot this back to you and tell me if I have this correct. Okay. Prior to the implementation of the new policy in early 2019, all employee emails were retained and recoverable going back in time for years; is that correct?
>
> A:     That's correct.[36]

Mr. Martin estimated that Wellpath had "[p]robably, you know, 10, 12 years worth of email" stored in its system before implementing this new policy in March 2019.[37]

Mr. Martin explained that Wellpath implemented this policy because "[t]he email store is very, very large at that point, so there's costs and risks and just – just a business need to have policies around how long you retain your emails and other documents."[38] When he was asked to describe "the risks associated with simply continuing with the old

---

[35] See RSTE CCS 11538-11540 (Ex. 22 to Devlin Decl.).
[36] See Martin Dep. at 22-24 (Ex. 21 to Devlin Decl.).
[37] See id. at 53-54.
[38] See id. at 44.

policy by retaining all emails," Mr. Martin responded: "Well, I mean, I think there's discovery risks and costs associated with that if you don't manage it, you know, in a standard way, right, and so just formalizing that so that we could communicate between ourselves and with outside folks in a standard way around retention."[39]   That led to the following discussion:

Q:     What do you mean by 'discovery risks'?

A:     Well, we're here today over this very topic, right?  And, you know, there's competing business needs in a business for the preservation of documents for different stakeholders.  And the company has to find ways to balance those costs and those risks.

Q:     I mean, prior to early 2019, all emails were retained.  What was the problem with that?

A:     Well, it's very costly to do.  Everything you do is exponentially more difficult when you have such a large number of emails.  And the information contained in that – in emails can be good or bad, right, depending on many, many factors.  So I don't think it's unusual for a business to do that.  This is a normal thing businesses do is have policies around document retention and email retention.

Q:     Was it part of the motivation of [Wellpath] in early 2019 that there should be a system in place to automatically delete older emails in case, for example, there were any bad emails out there?

A:     I wouldn't say that was –

MR. BECK:  Object to form.

THE WITNESS:     I wouldn't say that was a primary consideration, but it's certainly a consideration.

BY MR. BUDGE:
Q:     And did [Wellpath] take that into account in making the decision to

---

[39] See id. at 44-45.

implement that policy in March of 2019?

MR. BECK:  Object to form.

THE WITNESS:      It was a factor for sure.[40]

Wellpath could afford to continue retaining the old emails.  In October 2018, Wellpath estimated its annual revenues at $1,500,000,000.[41]  Mr. Martin estimated that the cost savings to Wellpath of this purge was "[e]asily a hundred thousand dollars a year."[42]

### C.    Wellpath Fails To Place A Legal Hold On Emails Before The Purge.

Two months before the purge, Geri Ashley, Wellpath's Director of Claims Management, sent an email to Wellpath's outside counsel announcing that Wellpath "is instituting a new Preservation Process."[43]  Ms. Ashley asked outside counsel to "identify each **open** case in your office" in order to "help us ensure key information is not being deleted from the preservation process."[44]  This request included claims that had not yet been filed.[45]  In a follow-up email, Saundra Robinson, a Wellpath Risk Management Consultant, warned outside counsel: "Please understand that a failure to respond may result in critical information being deleted, which may not reflect positively on your firm."[46]

The Lewis Brisbois firm was handling the Rocky Stewart claim for Wellpath.[47]  In January 2019, Nichol Bunn, a partner in that firm, responded to Wellpath's request and

---

[40] See id. at 45-46.
[41] See https://higcapital.com/correct-care-solutions-and-correctional-medical-group-companies-join-forces-to-deliver-best-in-class-healthcare/.(last accessed on March 7, 223).
[42] See Martin Dep. at 49 (Ex 21 to Devlin Decl.).
[43] See RSTE CCS 11504 (Ex. 26 to Devlin Decl.).
[44] See id.
[45] See January 16, 2019 letter from Craig McIvor (of Lee Smart) to Wellpath (Ex. 27 to Devlin Decl.).
[46] See RSTE CCS 11560 (Ex. 28 to Devlin Decl.).
[47] See August 30, 2018 letter from Eric Neiman to John Devlin (Ex. 16 to Devlin Decl.).

told Ms. Ashley that "I will get the information to you and Ms. Robinson today."[48]
Wellpath has not produced any documentation showing that the Lewis Brisbois firm
provided the requested information. Wellpath aggressively followed up with other outside
counsel, noting that "[i]t is imperative that we receive this information today."[49] Wellpath
has not produced any documentation to demonstrate similar follow-up with the Lewis
Brisbois firm.

Wellpath's Claims Department chose not to place a legal hold on any email boxes
in connection with Mr. Stewart's death, even though it never received a response from the
Lewis Brisbois firm and knew that the "failure to respond may result in critical information
being deleted * * *."[50] The Wellpath defendants are now blaming the Lewis Brisbois firm
for Wellpath's failure to preserve emails:

> Defendant Wellpath states that it relied on its outside counsel to inform
> Wellpath that a trigger has been met and a legal hold needs to be issued in
> this matter. Wellpath also relies on its outside counsel to inform Wellpath's
> Claims Managers of which custodians need to be placed on legal hold.
> Defendant Wellpath reasonably relied on its outside counsel assigned to the
> Stewart claim, as shown in [] RSTE CCS 11506-RSTE CCS 11521.[51]

By January 2019, Wellpath had received a tort claim notice and opened a claim file
related to Mr. Stewart's death. They had in-house counsel, up to and including the Chief

---

[48] See RSTE CCS 15104 (Ex. 29 to Devlin Decl.).
[49] See RSTE CCS 11558 (Ex. 30 to Devlin Decl.).
[50] See RSTE CCS 11560 (Ex. 28 to Devlin Decl.).
[51] See 2/24/23 letter from Jens Schmidt to John Devlin (Ex. 31 to Devlin Decl.). The documents cited by the Wellpath defendants are emails in late 2021 and early 2022, long after the email purges were complete. Those documents show that no litigation hold ever was placed on the Stewart matter and that the Lewis Brisbois firm agreed with the decision not to place a litigation hold related to the Stewart matter. See RSTE CCS 11506-11513 (Ex. 32 to Devlin Decl.); see also RSTE CCS 11517-11520 (Ex. 33 to Devlin Decl.); RSTE CCS 11516 (Ex. 12 to Devlin Decl.); RSTE CCS 11521 (Ex. 34 to Devlin Decl.).

Legal Officer, working on the email purge. They knew that they had not received a response from the Lewis Brisbois firm regarding litigation holds. Yet they did nothing to preserve any emails related to Mr. Stewart's claim.

### D.     Rocky Stewart's Estate Files This Lawsuit

On November 21, 2019, Mr. Stewart's estate filed this lawsuit. The named defendants included Wellpath, LLC, Correct Care Solutions, LLC, and Patricia Sauerbry.[52] On January 21, 2020, the Lewis Brisbois firm filed an Answer and Affirmative Defenses on behalf of all three of those defendants.[53]

### E.     Wellpath's Second Email Purge

On December 18, 2019, Mr. Strickland (a Wellpath IT Security Manager) informed several Wellpath employees that "[d]uring my discussions and review of the EDR [Electronic Data Retention] Project with Bob [Martin], I noticed we are not actively removing employee mailboxes who have been terminated long[er] than one year. Can you please get with the Exchange Team and write up how we are going to handle this? Automating this would be helpful and eliminate user error like missing the periodic removal or missing user mailboxes on accident."[54] Joel Jensen, Wellpath's Vice President for Information Technology, cautioned that same day:

> "Please do NOT simply delete the aged boxes and reply to Richard that this is done. Now that we've deleted old email there is a lot of scrutiny on email retention. Richard has had to make a sworn court attestation regarding it and Bob is being deposed by opposing council [sic] on a lawsuit, regarding email

---

[52] See Complaint (Ex. 1 to Devlin Decl.).
[53] See Defendant Wellpath, LLC; Correct Care Solutions, LLC and Patricia Sauerbry's Answer and Affirmative Defenses (Ex. 35 to Devlin Decl.).
[54] See RSTE CCS 11664-11665 (Ex. 36 to Devlin Decl.).

retention. So the procedures must be clear on this, and must be followed to the letter. The procedure needs to be clearly stated how the mailboxes that are on legal hold will be excluded from the set of mailboxes to be deleted. We want to review and approve the procedure before and [sic] deletion activity is started."[55]

In response to these mails, the Wellpath IT Department developed a process they called the "email purge project."[56] Again, Wellpath did not place a legal hold on any email boxes in connection with Mr. Stewart's death.

On April 6, 2020, the Wellpath IT Department performed the "first run of the email purge script" on over 5,000 mailboxes.[57] Defendant Patricia Sauerbry's email box was deleted as part of this purge.[58] Wellpath chose to delete her email box even though she was a named defendant in this lawsuit. Wellpath deleted 0.03 GB (or 30,000 KB) of data from her email box.[59]

### F.   Wellpath Gets Sanctioned And Pauses Its Email Purge Policy.

One month earlier, on March 4, 2020, the plaintiffs in a pending jail death case in the Eastern District of Washington – Estate of Moreno, et al. v. Correctional Healthcare Companies, et al., Case No. 18-cv-05171 – filed a Motion for Default Judgment.[60] The motion detailed how Wellpath intentionally destroyed emails in early 2019, even though the plaintiffs already had filed the case and served discovery requests. In addition, the motion explained how Wellpath failed to reveal for many months that the emails had been

---

[55] See RSTE CCS 11664-11665 (Ex. 36 to Devlin Decl.).
[56] See RSTE CCS 11666-11670 (Ex. 37 to Devlin Decl.).
[57] See RSTE CCS 11671 (Ex. 38 to Devlin Decl.); see also RSTE CCS 11672 (Ex. 39 to Devlin Decl.).
[58] See RSTE CCS 11672 (Ex. 39 to Devlin Decl.).
[59] See id.
[60] See Plaintiff's Rule 37(e) Motion for Default Judgment Against Defendants Correctional Healthcare Companies, Inc. and Correct Care Solutions, LLC for Spoliation of Evidence (Ex. 40 to Devlin Decl.).

destroyed and "only came clean * * * when an imminent response deadline to Plaintiffs'
third motion to compel forced them to confess their purge of e-mails eight months
earlier."[61]

On June 1, 2020, the Honorable Rosanna Malouf Peterson granted the motion and
entered a default judgment against Wellpath's predecessor companies.[62]  The Court found
that Mr. Martin "agreed during his deposition that one of the motivating factors behind
Defendants' decision to adopt the new email policy was to destroy bad emails that could
be produced in discovery" and that it was "reasonable to infer * * * that Defendants
purposefully destroyed evidence to avoid their litigation obligations."[63]  The Court also
noted that "[t]his litigation has been hindered significantly by Defendants' failure to
provide responsive discovery and their failure to admit in a timely fashion to their
destruction of evidence."[64]  The Court concluded that "[r]ather than telling Plaintiffs or the
Court what had occurred, Defendants misled Plaintiffs by promising to provide responsive
emails at a later date."[65]

On August 15, 2020, David Perry, the Chief Legal Officer and architect of the email
purges, sent an email to Mr. Martin and to Ben Slocum (then Chief Operating Officer and
current President and Interim Chief Executive Officer):

> Bob, in light of this issue, which has the potential to be very negative for
> some of our litigated claims, I am asking you to immediately suspend our
> electronic document retention policy.   No emails should be deleted,

---

[61] See id.
[62] See Estate of Moreno, et al. v. Correctional Healthcare Companies, Inc., et al., 2020 WL 5740265 (E.D. Wash. June 1, 2020) (attached as Exhibit 41 to Devlin Decl.).
[63] See id. at *6-*7.
[64] See id. at *8.
[65] See id. at *10.

automatically or otherwise, until we get this properly assessed and worked out. Please confirm back to me that this suspension can be, and has been, implemented. Sorry for the inconvenience but we simply have to do this.[66]

Joel Jensen, a member of the Wellpath IT Department, responded later that day:

We have conferred within IT and believe the most expeditious method of accomplishing your objective is to place 100% of the mailboxes in our email system on litigation hold. This will cause all email for all mailboxes to be retained indefinitely until the litigation hold status is removed. We would then work with you and the legal department in the upcoming weeks to make further decisions and implement them. This change will cause the permanent retention of all email for all mailboxes in our system today.[67]

Unfortunately, this pause in the purge was too late to repair the damage done in this case. Wellpath already had deleted the email box of former employee and named defendant Patricia Sauerbry on April 6, 2020. In addition, Wellpath already had deleted all or almost all emails older than August 2019 for the management team at the Coos County jail -- then-current employees Kathleen Weaver (the HSA), Clint Banning (the Nurse Practitioner), Dr. Paul Bilder (the Site Medical Director), and Dr. Vivek Shah (the Regional Medical Director).[68] Wellpath did not place a legal hold on any of their email boxes before the August 2020 company-wide pause.[69]

### G.    Plaintiff Attempts To Get Emails From The Wellpath Defendants.

On July 30, 2020, plaintiff served his First Request for Production of Documents.[70]

---

[66] See RSTE CCS 15531 (Ex. 42 to Devlin Decl.).
[67] See RSTE CCS 15560 (Ex. 43 to Devlin Decl.). Wellpath did not change its aggressive deletion policy for new employees. See id. ("Email boxes for new hires that occur Monday and going forward will not be on litigation hold and will be subject to being [sic] normal email retention policies.").
[68] See Defendant Wellpath, LLC and Correct Care Solutions, LLC's Response to Plaintiff's Third Set of Interrogatories, Responses No. 7-10 (Ex. 44 to Devlin Decl.).
[69] See id.
[70] See Plaintiff's First Request for Production of Documents (Ex. 45 to Devlin Decl.).

Page 18 – PLAINTIFF'S MOTION FOR SANCTIONS

That discovery request specifically sought "all electronically stored information * * * including but not limited to emails and text messages."  On September 30, 2020, the Wellpath defendants provided their Response to Plaintiff's First Request for Production.[71]

On July 2, 2021, counsel for plaintiff wrote a letter to counsel for the Wellpath defendants to confer about Wellpath's responses to the first RFP.[72]  In that letter, plaintiff's counsel noted that "we did not receive any emails, text messages or other similar items in response to any of our discovery requests.  Please produce responsive documents in those formats, or confirm that no such documents exist."

On August 12, 2021, counsel for the Wellpath defendants responded to that letter.[73] The response did not address the email issue.  The Wellpath defendants did not mention Wellpath's email purge policy and did not inform plaintiff's counsel that all or almost all of the potentially responsive emails of key Coos County employees (including named defendant Patricia Sauerbry) had been deleted more than a year earlier.

On September 1, 2021, counsel for plaintiff sent a list of proposed email search terms to counsel for the Wellpath defendants and counsel for the Coos County defendants.[74]  On September 10, 2021, in response to a request from counsel for the Coos County defendants, plaintiff's counsel sent the first revised list of email search terms to all counsel.[75]

---

[71] See Defendant Wellpath, LLC, Correct Care Solutions, LLC, and Patricia Sauerbry's Response to Plaintiff's First Request for Production (Ex. 46 to Devlin Decl.).
[72] See July 2, 2021 letter from John Devlin to Bruce Smith and Aryn Seiler (Ex. 47 to Devlin Decl.).
[73] See August 12, 2021 letter from Bruce Smith and Aryn Seiler to John Devlin (Ex. 48 to Devlin Decl.).
[74] See September 1, 2021 email from Paul Galm to all counsel (Ex. 49 to Devlin Decl.).
[75] See September 10, 2021 email from Paul Galm to all counsel (Ex. 50 to Devlin Decl.).

On September 20, 2021, counsel for the Wellpath defendants objected to the proposed list of search terms.[76]  He noted that "Wellpath/CCS has a [sic] obligation to go through every document and look for potential HIPAA privacy issues and make redactions. That is a very laborious and time-consuming process.  If there are any attachments to emails, those have to be reviewed for content, and any further objections.  Is Plaintiff willing to foot the bill for the price of producing items?  This would be client costs, attorney and paralegal time, data base management if required, etc?"  Wellpath's counsel failed to mention Wellpath's email purge policy and the deletion of the emails of its key employees. Instead, Wellpath's counsel attempted to discourage plaintiff from searching for emails by threatening to make plaintiff pay the cost.

On November 15, 2021, counsel for plaintiff sent the second revised list of email search terms to counsel for all defendants.[77]

On November 24, 2021, counsel for the Wellpath defendants sent a letter in response to this email.[78]  In that letter, he objected to the all aspects of the proposed search (such as timeframe and scope) and he objected "given the likely costs of production."  He cited an example of a case that involved over 45,000 documents, which "were pared down to approximately 4,500 documents" in a process that took over 200 hours.  He argued that the costs of the search in this case "would even be higher" and noted that "Wellpath reserves the right to insist that Plaintiff pay the costs (vendor, client, and attorney time) for

---

[76] See September 20, 2021 email from Bruce Smith to Paul Galm (Ex. 51 to Devlin Decl.).
[77] See November 15, 2021 email from Paul Galm to all counsel (Ex. 52 to Devlin Decl.).
[78] See November 24, 2021 letter from Bruce Smith to Paul Galm (Ex. 53 to Devlin Decl.).

production." Wellpath's counsel again failed to mention Wellpath's email purge policy and the deletion of the emails of its key employees.

On December 1, 2021, plaintiff's counsel alerted the Court to the discovery dispute between the parties regarding the scope of email discovery. The Court directed the parties to submit an email summarizing the disputed issues.

On December 21, 2021, in a continuing effort to respond to their concerns, counsel for plaintiff sent a third revised list of email search terms to counsel for all defendants.[79] On January 4, 2022, counsel for plaintiff submitted those revised search terms to the Court, along with an email summarizing the dispute between the parties.[80] The Court scheduled a hearing for January 27, 2022.

## H.    Wellpath Repeatedly Fails To Disclose The Email Purges.

On January 24, 2022, counsel for plaintiff submitted an email to the Court regarding the dispute.[81] Counsel for plaintiff outlined the reasons for the email search terms and noted that plaintiff had agreed to "limit the timeframe of plaintiff's search to 2014-2018."

That same day, counsel for the Wellpath defendants also submitted an email to the Court regarding the dispute.[82] In that email, he wrote: "Counsel for Wellpath has been very candid with all counsel regarding email search terms and the hidden perils and costs of such discovery." He described a recent case in which "over 200 hours of attorney and paralegal time were spent and tens of thousands of dollars were spent to produce

---

[79] See December 21, 2021 email from Paul Galm to all counsel (Ex. 54 to Devlin Decl.).
[80] See January 4, 2022 email from Paul Galm to the Court (Ex. 55 to Devlin Decl.).
[81] See January 24, 2022 email from Paul Galm to the Court (Ex. 56 to Devlin Decl.).
[82] See January 24, 2022 email from Bruce Smith to the Court (Ex. 57 to Devlin Decl.).

documents.  The production process took over three months to complete."  In an effort to deter plaintiff from pursing this matter, he suggested that Wellpath might ask the Court to order plaintiff "to pay all the costs of production" because "[t]his sorting process is time consuming, which means fees and costs to sort through whether the email is arguably relevant to the case."  He also detailed Wellpath's objections to the proposed search terms. With regard to the search term "Sauerbry," he wrote: "This category is overly broad and seeks information not relevant.  For example, payroll, withholding, benefits, vacation, etc. could all be pulled up in a search by Sauerbry.  Routine emails from Sauerbry would likely be pulled.  Ms. Sauerbry may have written emails about other patients, which then gets into HIPAA."  Wellpath's counsel again failed to mention Wellpath's email purge policy and the deletion of the emails of its key employees.

On January 27, 2022, the Court held a status conference.[83]  Counsel for the Wellpath defendants talked about the time and expense involved in email searches.  The Court stated: "So there can't be that many employees of Wellpath at Coos County, so it shouldn't be that hard to search all – you know, all of their email with the – with all the search terms that are requested."[84]  Counsel for the Wellpath defendants assured the Court: "I'm going to call the IT person, and I've typed exactly what the Court has said and what counsel's agreed to, and I'm just going to dump it on them and just say, 'Just make it happen.'"[85]  He added: "We will go through names, we will look at e-mail files for search terms."[86]  Wellpath's

---

[83] See January 27, 2022 transcript (Ex. 58 to Devlin Decl.).
[84] See id. at 24.
[85] See id. at 27.
[86] See id. at 28.

counsel again failed to mention Wellpath's email purge policy and the deletion of the emails of the its key employees.

The following day, counsel for plaintiff sent an email to counsel for all defendants summarizing the results of the conference and proposed a fourth list of revised email search terms.[87]  This revised list was a further good faith effort to respond to the concerns raised by Wellpath's counsel.

On February 8, 2022, counsel for the Wellpath defendants responded to this email.[88] He accused plaintiff's counsel of misrepresenting the results of the hearing in "an attempt to create a new discovery dispute after a court hearing the previous day.  In other words, you're trying to create a motion for reconsideration."[89]  He noted that one result of the conference "was email searches for 2014-2018" and that "our search for terms will be for employee emails at the jail from 2014 to 2018."  He also reiterated that "these searches are not easy, or inexpensive.  * * * These searches are also not quick."  He again failed to inform plaintiff's counsel that the relevant emails already had been deleted.

On February 15, 2022, plaintiff's counsel sent a copy of the January 27, 2022 hearing transcript and responded to the objections raised by counsel for the Wellpath defendants.[90]  Counsel for the plaintiff agreed "to a timeframe of 2014 through 2018 for all emails, whether it is Coos County or Wellpath" and provided a fifth revised list of search terms.  That same day, counsel for the Wellpath defendants responded: "I'm checking with

---

[87] See January 28, 2022 email from Paul Galm to all counsel (Ex. 59 to Devlin Decl.).
[88] See February 8, 2022 email from Bruce Smith to Paul Galm (Ex. 60 to Devlin Decl.).
[89] See id.
[90] See February 15, 2022 email from Paul Galm to Bruce Smith (Ex. 61 to Devlin Decl.).

Page 23 – PLAINTIFF'S MOTION FOR SANCTIONS

my client."[91]

On February 27, 2022, plaintiff's counsel asked counsel for the Wellpath defendants for a status report on the email search term issue.[92] After he did not receive a response, plaintiff's counsel sent another reminder on March 8, 2022.[93] That same day, counsel for the Wellpath defendants sent the following response:

> Since my last correspondence I have followed up regarding a word search. I had assumed that a search based just on a word could be done. That is not the case.
>
> I have since been advised that Wellpath cannot conduct a company wide search by just a word search. Wellpath would have to a [sic] search in *each employee's* mailbox. If there were 500 or 1,000 employees, then 500 or 1,000 separate searches would have to be done for just *one term*. You are asking for 10 different search terms, however. If there were 500 employees and 10 words/terms, then 5,000 individual searches would have to conducted. If there were 1,000 employees, then 10,000 searches would have to be conducted (10 x 500/1000). To conduct a nationwide search under individual employee's email would be unduly burdensome and cost-prohibitive, and is disproportionate to the needs of the case. A search is being conducted of the emails for the employees in the jail.[94]

Even after getting direction from this Court during the January status conference, the Wellpath defendants continued to argue about the burden of searching for emails that Wellpath had deleted almost two years earlier. As noted above, the email purge policy was well known to Wellpath's legal department, claims department, and IT department.

On March 12, 2022, plaintiff's counsel agreed to a search of the emails of Wellpath employees who worked in or supervised people at the Coos County Jail, with specific

---

[91] See February 15, 2022 email from Bruce Smith to Paul Galm (Ex. 62 to Devlin Decl.).
[92] See February 27, 2022 email from Paul Galm to Bruce Smith (Ex. 63 to Devlin Decl.).
[93] See March 8, 2022 email from Paul Galm to Bruce Smith (Ex. 64 to Devlin Decl.).
[94] See March 8, 2022 email from Bruce Smith to Paul Galm (Ex. 65 to Devlin Decl.).

reference to Dr. Bilder and Dr. Shah.[95]  Plaintiff's counsel continued to believe that the Wellpath defendants were participating in discovery process in good faith.

On March 30, 2022, plaintiff's counsel submitted a status report to the Court, noting the continued discovery disputes with the Wellpath defendants.[96]

On April 11, 2022, the Court held a second status conference.[97]  Counsel for the Wellpath defendants told the Court: "We did have Wellpath go through and do a search terms search.  And we advised Plaintiff's counsel that we had to do it mailbox by mailbox. We have emails that I've got to go through.  * * * And, this afternoon, I should be able to go through those and review them for production, and then we will get those out this week."[98]  Counsel for the Wellpath defendants again did not mention the email purge policy or the deleted emails.

On April 14, 2022, counsel for the Wellpath defendants produced documents and represented that those documents were the "results of searches of individual email boxes using the designated search terms * * * ."[99]  The Wellpath defendants knew that plaintiff's counsel and the Court would assume that Wellpath had searched defendant Patricia Sauerbry's email box using the agreed upon terms.  They knew that plaintiff's counsel and this Court were relying upon their representations.  They chose not to disclose Wellpath's email purge policy and the deletion of the emails of the key Wellpath employees.

---

[95] See March 12, 2022 email from Paul Galm to Bruce Smith (Ex. 66 to Devlin Decl.).
[96] See March 30, 2022 email from Paul Galm to the Court (Ex. 67 to Devlin Decl.).
[97] See April 11. 2022 transcript (Ex. 68 to Devlin Decl.).
[98] See id. at 7.
[99] See April 14, 2022 email from Julie Albright to all counsel (Ex. 69 to Devlin Decl.).

Plaintiff's counsel reviewed the April 14, 2022 production and found no emails from defendant Patricia Sauerbry and only a few emails from HSA Kathleen Weaver.[100]  On June 10, 2022, the Coos County defendants produced over 3,000 pages of emails.[101] Plaintiff's counsel noticed that the Coos County defendants produced emails from Kathleen Weaver containing some of the search terms.  The Wellpath defendants should have produced the same emails.

On June 21, 2022, counsel for the plaintiff asked counsel for the Wellpath defendants why plaintiff received responsive emails authored by Kathleen Weaver from Coos County but not from Wellpath.[102]  Plaintiff's counsel also noted that Wellpath produced far fewer emails than Coos County and that "[t]his dearth of emails in conjunction with finding emails in the County's production that should have been produced by Wellpath is concerning.  Did your client conduct a proper search of the emails of all Wellpath employees that either worked with or supervised the Coos County Jail between 2014 and 2018?"  After nearly a month without a response to this inquiry, plaintiff's counsel sent a reminder on July 15, 2022.[103]

Finally, on July 18, 2022, counsel for the Wellpath defendants replied:

A proper search was conducted.  It is my understanding that Wellpath's email retention policy is one year.  I have represented other private health care entities (not prison providers) who have had even shorter email retention

---

[100] On May 26, 2022, the Court held a third status conference.  The parties updated the Court on the progress of discovery.  See May 26, 2022 transcript (Ex. 70 to Devlin Decl.).

[101] See June 10, 2022 email from Joanna Ritchie to all counsel (Ex. 71 to Devlin Decl.).  Coos County's approach to discovery stands in marked contrast to Wellpath's approach. See, e.g., COUNTY 04226 (May 13, 2018 email from Eric Zanni to other supervisors re importance of responding to requests from plaintiff's counsel) (Ex. 72 to Devlin Decl.).

[102] See June 21,2022 email from Paul Galm to Bruce Smith and Iain Armstrong (Ex. 73 to Devlin Decl.).

[103] See July 15, 2022 email from Paul Galm to Bruce Smith and Iain Armstrong (Ex. 74 to Devlin Decl.).

> policies. The County has different retention policies than does Wellpath. Thus, it is not surprising that there is a difference in the emails that were produced.[104]

This was the first time that plaintiff's counsel heard anything about a one-year retention policy. The parties had been discussing email discovery among themselves for a year and with the Court for six months. Instead of taking this opportunity to disclose the email purge policy and the deletion of emails of their Coos County employees, the Wellpath defendants characterized their behavior as standard industry practice.

On July 29, 2022, the Court held a fourth status conference. Plaintiff's counsel informed the Court about Wellpath's failure to produce emails from Kathleen Weaver and the new information about Wellpath's one-year retention policy.[105] The Court ordered the Wellpath defendants to "bring me a proposal about how those emails are going to be recovered. And you're going to pay the cost of recovering those emails. This cannot keep happening in these cases. I won't tolerate it, and you're on notice, and it's professionally unacceptable, period."[106]

On August 12, 2022, counsel for the Wellpath defendants submitted their Discovery Proposal.[107] That document contained the following paragraph:

> CCS had previously advised the Court and the parties that email searches had to be conducted based on individual mailboxes, i.e., each employee who has or had an email. This would have been thousands of individual searches. Through the meet and confer process, the CCS search was confined to email searches of its Coos County jail employees from 2014 through 2018. The

---

[104] See July 18, 2022 email from Bruce Smith to Paul Galm (Ex. 75 to Devlin Decl.).
[105] See July 29, 2022 transcript, at 4 (Ex. 76 to Devlin Decl.).
[106] See id. at 7.
[107] See Defendant Wellpath, LLC, Correct Care Solutions, LLC, and Patricia Sauerbry's Discovery Proposal (Ex. 77 to Devlin Decl.).

Page 27 – PLAINTIFF'S MOTION FOR SANCTIONS

results of the CCS search was smaller than the County's production. However, CCS has produced some emails dating back to 2015.[108]

The Wellpath defendants' submission included information from an IT consultant (Consilio), which stated that it would "determine a list of custodians or individuals who are likely to house responsive documents.  Any custodian identified will be preserved immediately in a manner that is consistent with industry best practices and that maintains the integrity of the data set(s) in question."[109]  Consilio noted that "all data will be culled and limited to an agreed upon date range of January 1, 2014 through December 31, 2018. This will be applied to all custodian data sets."[110]  The Wellpath defendants again did not disclose the email purge policy and did not admit that all or almost all of the potentially responsive emails of all key "custodian data sets" (including named defendant Patricia Sauerbry) had been permanently deleted more than two years earlier.  The reference to producing "some emails dating back to 2015" was an effort to obfuscate the nationwide email purge.

On September 15, 2022, the Court held a fifth status conference.  Jeff Stoneking, an IT consultant from Consilio, told the Court that "our team has taken some extensive efforts, first and foremost, to work in conjunction with Wellpath and outside counsel to collect and receive all available emails for the custodians that were proposed by the parties.  That list is fairly significant in terms of size.  We have just over 30 custodians, I believe, that the parties had identified.  So one of the first steps in our process was to work very closely

---

[108] See id. at 5.
[109] See id., Ex. 5.
[110] See id., Ex. 5.

with the IT resources on the Wellpath front to understand the types of email systems that they were using to communicate messages, as well as the types of archive systems that were in place to back up messages."[111]  Mr. Stoneking added: "We collected entire mailboxes as a part of that effort from the active email environment, as well as anything that was contained in the Wellpath archive systems, assuming information existed, in full."[112]

Plaintiff's counsel asked: "[H]ow do we determine if certain custodians' emails have been purged and on what date?  * * * How do we find out what's not there and the dates on which they were purged?"[113]  Mr. Stoneking responded: "[T]hat's something that can be somewhat of I think a complicated process."[114]  He then delivered a lengthy response designed to persuade the Court not to order a forensic analysis that "would place, in my opinion, significant undue burden on Wellpath to perform that type of analysis, given the breadth, the scope, the time, and the expense to conduct that exercise."[115]  Plaintiff's counsel then referenced the Moreno decision and Wellpath's nationwide email purge policy, noting that "[w]e want to figure out if that applies to us too.  We want to figure out if a purge has happened."[116]  Plaintiff's counsel specifically asked whether and when Wellpath had purged Patricia Sauerbry's emails.[117]  The Court scheduled another hearing

---

[111] See September 15, 2022 transcript, at 8-9 (Ex. 78 to Devlin Decl.).
[112] See id. at 10.
[113] See id. at 10-11.
[114] See id. at 11.
[115] See id. at 11-15.
[116] See id. at 15-16.
[117] See id. at 16-17.

Page 29 – PLAINTIFF'S MOTION FOR SANCTIONS

to "find the answer to the question you just posed."[118]

On September 30, 2022, counsel for the plaintiff sent an email to counsel for the Wellpath defendants noting that the October 6, 2022 hearing would include an update from their IT consultant "on efforts to recover any deleted emails and on the production of electronic discovery overall.  Per the Court's request during the hearing, this includes confirming whether or not Patricia Sauerbry's emails have been deleted."[119]

On October 4, 2022, counsel for the Wellpath defendants sent a letter to counsel for the plaintiff that summarized the content of Wellpath's September document productions.[120]  That letter stated that one batch of documents "were email to the extent they existed from the following custodians * * * ."  The letter did not disclose the deletion of all of Patricia Sauerbry's emails or the deletion of all or almost all emails before August 2019 of Dr. Paul Bilder, Kathleen Weaver, Clinton Banning, and Dr. Vivek Shah.  It simply listed those people as "custodians."

On October 6, 2022, the Wellpath defendants filed a pleading prior to the hearing.[121] In that pleading, the Wellpath defendants wrote: "Given the importance of this matter to all involved, Defendants request a reasonable period of time to thoroughly examine the still-existing email accounts, to examine not only the contents of the emails themselves but also the manner in which the relevant email custodians used their email accounts.  Such a

---

[118] See id. at 18.
[119] See September 30, 2022 email from Paul Galm to Bruce Smith and Iain Armstrong (Ex. 79 to Devlin Decl.).
[120] See October 4, 2022 letter from Bruce Smith to Paul Galm and others (Ex. 80 to Devlin Decl.).
[121] See Defendant Wellpath, LLC, Correct Care Solutions, LLC, and Patricia Sauerbry's Notice and Filing of Affidavit (Ex. 81 to Devlin Decl.).

process would give insight to the parties as to whether these email searches are calculated to lead to relevant evidence in the cause."[122]  The pleading also included an affidavit from Sameer Pansare, an IT consultant from Consilio, about "the steps that would have to be undertaken to attempt any forensic recovery of emails, and projections of possible costs for such a search.  The affidavit also includes information regarding the likelihood of recovering information."[123]

The Pansare affidavit contained a section on "Wellpath's Email Environment" that does not mention the email purges in 2019 and 2020.  The Pansare affidavit described an extensive process to try to recover emails that Wellpath already knew it had permanently deleted.  The affidavit quoted a very high cost (almost $500,000) in an attempt to deter the Court from inquiring further.  The affidavit noted that "it is important to appreciate that there is an extremely low likelihood of successful retrieval of mailboxes that were not retained, including that of Ms. Sauerbry."[124]  The affidavit added that Wellpath had collected email from other custodians, again without mentioning that all or almost all of their emails before August 2019 already had been deleted.

On October 6, 2022, the Court held a sixth status conference.  Counsel for the Wellpath defendants referred the Court to the Pansare affidavit, stating that "the cost of trying to recreate or find missing emails is roughly half a million dollars."[125]  After plaintiff's counsel noted that "it seems clear to me from reading the document – reading

---

[122] See <u>id.</u> at 4.
[123] See <u>id.</u> at 5.
[124] See <u>id.</u> at 16.
[125] See October 6, 2022 transcript, at 4 (Ex. 82 to Devlin Decl.).

Page 31 – PLAINTIFF'S MOTION FOR SANCTIONS

between the lines of the document – that Nurse Sauerbry's email box appears to have been deleted,"[126] Wellpath's counsel told the Court that "[w]e have not found the Sauerbry email folder."[127]  Plaintiff's counsel reminded the Court that "[a]fter over a year of negotiating about these emails, Nurse Sauerbry's email box is gone and cannot apparently be recovered.  And so we've been talking about this for more than a year without that information being provided to us."[128]  Counsel for the plaintiff indicated that he was "inclined to move for sanctions up to and including the sanctions that were imposed in the Moreno case based on this information"[129]  The Court stated: "I'm very disturbed in how this has been handled.  I think I have been clear at every hearing that I expect much better professionalism and candidness and effort with the Court."[130]

On October 14, 2022, Wellpath's out-of-state counsel (Eric Schoonveld) filed a motion to appear *pro hac vice* in this case.[131]  On October 20, 2022, Wellpath's new local counsel (the Hutchinson Cox firm) replaced the Lewis Brisbois firm.[132]

On October 24, 2022, Wellpath's new counsel filed a motion to extend certain discovery deadlines.[133]  In that motion, Wellpath's new counsel did not mention either of the email purges.  Rather, Wellpath's new counsel again described the proposal by Consilio "regarding the steps that could be taken in an attempt to recover absent electronic data and

---

[126] See id. at 6.
[127] See id. at 10.
[128] See id. at 20.
[129] See id. at 21.
[130] See id. at 22.
[131] See ECF No. 75.
[132] See ECF No. 78.
[133] See Defendant Wellpath, LLC's Motion for Extension of Certain Discovery Deadlines (Ex. 83 to Devlin Decl.).

electronic messages in Wellpath's effort to locate and produce, the likelihood of success, as well as the cost of Consilio's services for recovery efforts."[134]  Wellpath's new counsel also noted that, more than two years after plaintiff's first Request for Production, there were "approximately 60 banker's boxes in the Coos County jail [that] have not been fully reviewed."[135]

In an accompanying declaration, Mr. Schoonveld noted that he had represented Wellpath "for a number of years in a number of jurisdictions.  I have worked with both the prior claims team and general counsel and the current claims team and general counsel."[136] Mr. Schoonveld acknowledged that one of the questions to be resolved was: "Has Wellpath retained the email records of Nurse Patricia Sauerbry?"[137]  He explained that he had "conducted in person meetings in Nashville with Wellpath claims and counsel and with Consilio team members" and "conducted in person meetings in Portland with Wellpath's prior counsel, Bruce Smith and his team."[138]

On November 17, 2022, plaintiff's counsel had a conference call with Wellpath's new counsel.  During that call, Wellpath's new counsel finally acknowledged that Wellpath purged Ms. Sauerbry's emails after she left Wellpath's employment in July 2018.  He also acknowledged that Wellpath had received plaintiff's May 2018 tort claim notice but did

---

[134] See id. at 3.

[135] See id.

[136] See Declaration of Eric Schoonveld in Support of Defendant Wellpath, LLC's Motion for Extension of Certain Discovery Deadlines, ¶ 2 (Ex. 83 to Devlin Decl.).  Two years earlier, Mr. Schoonveld was counsel for Correct Care Solutions in another case involving the email purge policy.  See Marziale v. Correct Care Solutions LLC, 2020 WL 4744859 (E.D. Ark. July 28, 2020), adopted as modified, 2020 WL 4582693 (E.D. Ark. Aug. 10, 2020).

[137] See Declaration of Eric Schoonveld in Support of Defendant Wellpath, LLC's Motion for Extension of Certain Discovery Deadlines, ¶ 4 (Ex. 83 to Devlin Decl.).

[138] See id., ¶ 5.

not put a legal hold on Ms. Sauerbry's email box.

On November 22, 2022, plaintiff's counsel emailed Wellpath's new counsel to ask whether Ms. Weaver's emails were deleted or subject to a legal hold.[139]  On November 30, 2022, Wellpath's new counsel responded: "I believe there was a litigation hold placed on Kathi Weaver's mailbox.  We are working through the dates and details."[140]

On December 6, 2022, Wellpath's new counsel filed a Corrected Supplemental Affidavit of Sameer Pansare ("Second Pansare Affidavit").[141]  The Second Pansare Affidavit stated: "Patricia Sauerbry was terminated on July 17, 2018.  Wellpath's new retention policy providing a 12-month retention was implemented between February through April, 2019.  Consistent with the new retention policy, as of July 18, 2019, no further emails for Patricia Sauerbry were retained."[142]  The Second Pansare Affidavit did not disclose that Wellpath actually deleted Ms. Sauerbry's email box during the second purge in April 2020, after the Lewis Brisbois firm had filed an Answer on her behalf.  The Second Pansare Affidavit again noted that Wellpath had searched other email boxes, but did not mention that all or almost all emails from those email boxes prior to August 2019 had been deleted.[143]

On December 6, 2022, the Court held a seventh status conference.[144]  During that hearing, counsel for the Wellpath defendants stated in the discussion about any legal holds

---

[139] See November 22, 2022 email from Paul Galm to Eric Schoonveld (Ex. 84 to Devlin Decl.).

[140] See November 30, 2022 email from Eric Schoonveld to Paul Galm (Ex. 84 to Devlin Decl.).

[141] See Corrected Supplemental Affidavit of Sameer Pansare Sr Manager of Forensics and Expert Services, Consilio (Ex. 85 to Devlin Decl.).

[142] See id. at 4.

[143] See id. at 5.

[144] See December 6, 2022 transcript (Ex. 86 to Devlin Decl.).

on Ms. Sauerbry's email box that "[i]t took a little while to get Consilio and all the IT people to confirm that, and that's what led to this affidavit that we filed last week."[145]  He also confirmed that Ms. Weaver's email box "was not on a legal hold as of 2020."[146]  Plaintiff's counsel indicated that plaintiff would serve discovery requests on this issue because "we're still not getting really clear information."[147]

On January 9, 2023, plaintiff's counsel served a series of discovery requests related to the email issue.[148]  On February 8, 2023, the Wellpath defendants responded to plaintiff's discovery requests.[149]  In those responses, plaintiff's counsel learned or confirmed the following facts:

- ■ Wellpath received the March 2018 evidence preservation notice.

- ■ Wellpath's Claims Department opened a claim related to Rocky Stewart's death in April 2018.

- ■ Wellpath received the May 2018 tort claim notice.

- ■ Wellpath engaged in a second email purge in April 2020.  During that purge, Wellpath permanently deleted Patricia Sauerbry's email box.

- ■ Wellpath paused its email purge policy in August 2020.  Prior to that pause, Wellpath permanently deleted all or almost all of the emails of Kathleen Weaver, Dr. Vivek Shah, Dr. Paul Bilder, and Clint Banning from before August 2019.

- ■ Wellpath never placed a litigation hold in connection with Rocky Stewart's death.

---

[145] See id. at 8.

[146] See id.

[147] See id. at 11.

[148] On January 23, 2023, the Court held an eighth status conference.  The parties updated the Court on the status of discovery.  See January 23, 2023 transcript (Ex. 87 to Devlin Decl.).

[149] See Defendant Wellpath, LLC and Correct Care Solutions, LLC's Response to Plaintiff's Supplemental Requests for Admissions (Ex. 88 to Devlin Decl.); see also Defendant Wellpath, LLC and Correct Care Solutions, LLC's Response to Plaintiff's Third Set of Interrogatories (Ex. 89 to Devlin Decl.)

- Wellpath knew all of the above-referenced facts while its counsel was conferring with plaintiff's counsel about email discovery since July 2021.

- Wellpath knew all of the above-referenced facts while its counsel and consultants appeared at seven status conferences with the Court throughout 2022.

On February 9, 2023, plaintiff's counsel sent an email to counsel for the Wellpath defendants with some follow-up questions regarding the materials produced the previous day.[150] On February 24, 2023, counsel for the Wellpath defendants responded by letter and produced some additional documents.[151] In that letter, however, counsel for the Wellpath defendants continued to minimize Wellpath's misconduct.

First, counsel for the Wellpath defendants said that Wellpath deleted "only 0.03 GB" of data from Ms. Sauerbry's email box on April 6, 2020. They ignored that this deletion took place after Ms. Sauerbry had appeared as a named defendant in this lawsuit.

Second, counsel for the Wellpath defendants wrote: "Defendant Wellpath reminds Plaintiff's counsel that Patricia Sauerbry's employment ended July 17, 2018, over a year before this lawsuit was filed (November 21, 2019) and Sauerbry was specifically named as an involved employee. Neither the preservation letter nor the tort claim notice identify Sauerbry. It was not until the November 21, 2019 Complaint that Sauerbry was identified. Thus, in line with Electronic Data Retention Policy, email for Sauerbry was deleted in the ordinary course of business." They ignored that Wellpath had ample notice that Ms. Sauerbry was the most relevant employee for this claim. For example, she was interviewed by the Oregon State Police after his death, because she was the only Wellpath employee

---

[150] See February 9, 2023 email from John Devlin to all counsel (Ex. 90 to Devlin Decl.).
[151] See February 24, 2023 letter from Jens Schmidt to John Devlin (Ex. 31 to Devlin Decl.).

on duty while Mr. Stewart was in the Coos County Jail. They also ignored that the legal hold requirement included claims that had not yet been filed.[152]

Third, counsel for the Wellpath defendants said that Wellpath "ran broad search terms" for Ms. Sauerbry's emails in the email boxes of Dr. Paul Bilder, Kathleen Weaver, Clint Banning, Dr. Vivek Shah, and others. They continued to ignore the fact that Wellpath deleted all or almost all of their emails before August 2019 as part of the email purge.

Fourth, counsel for the Wellpath defendants wrote: "Defendant Wellpath remains willing to consider additional custodians and/or search terms proposed by Plaintiff's counsel." They continued to ignore the fact that the damage is done. The emails are gone. They know that this offer is illusory and only designed to make the Court believe that the Wellpath defendants are doing everything they can to rectify this problem.

After almost two years of negotiations and conferral regarding email discovery, plaintiff's counsel and the Court finally know what Wellpath did in this case. Wellpath carried out two email purges, approximately a year apart. Those email purges resulted in the permanent deletion of all of defendant Patricia Sauerbry's emails and all or almost all emails before August 2019 of the key Wellpath management personnel at the Coos County Jail. Wellpath knew all of those facts by September 2020, when it served its initial response to plaintiff's Request for Production, but chose not to disclose them.

---

[152] See notes 14, 45 above.

## ARGUMENT

Plaintiff asks this Court to impose sanctions on the Wellpath defendants pursuant to FRCP 37(e) for failure to preserve electronically stored information ("ESI") and pursuant to the Court's inherent authority.[153]  "The applicable standard of proof for spoliation motions in the Ninth Circuit is the preponderance of evidence."[154]

As outlined above, the Wellpath defendants permanently deleted the emails of a named defendant and the management team at the Coos County Jail.  Wellpath instituted a nationwide email purge policy in order to eliminate "discovery risk" and deprive plaintiffs across the country from obtaining relevant emails.  Wellpath then spent more than a year failing to disclose its email purge to plaintiff's counsel and the Court.  This behavior by Wellpath is consistent with other actions in this case and with its conduct in litigation across the country.  The only proper sanction is the entry of a default judgment against all of the Wellpath defendants.

### A.    The Court Should Sanction Wellpath For Its Failure to Preserve Emails.

Federal Rule of Civil Procedure 37(e) states that a court may impose sanctions "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery * * * ."  District courts

---

[153] See Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006) (identifying FRCP 37 and "the inherent power of federal courts to levy sanctions in response to abusive litigation practices" as the "two sources of authority under which a district court can sanction a party who has despoiled evidence").

[154] See OmniGen Research v. Yongqiang Wang, 321 F.R.D. 367, 372 (D. Or. 2017).

in the Ninth Circuit have translated that rule into a three-part test.[155]   The misconduct of the Wellpath defendants satisfies each element of that test.

### 1.    *The Emails Should Have Been Preserved In The Anticipation Or Conduct of Litigation*

The Wellpath defendants clearly had a duty to preserve the purged emails.   By March 2019, when the first email purge began, the Wellpath defendants had received an evidence preservation letter, a tort claim notice, and a document request from plaintiff's counsel related to Mr. Stewart's death.   The tort claim notice stated that "a claim for damages will be made against Correct Care Solutions [now Wellpath], as well as any employees of Correct Care Solutions who caused damage to, or the death of, Mr. Stewart."[156]   The Wellpath Claims Department had opened up a claim related to the death of Rocky Stewart.   That information provided ample notice to the Wellpath defendants that a lawsuit likely would be filed in connection with Mr. Stewart's death.[157]   In addition, Wellpath's own policy regarding litigation holds noted that Wellpath "may at times become subject to a duty to preserve (or halt the destruction of) documents once litigation, an audit or a government investigation is reasonably anticipated."[158]   Wellpath's response

---

[155] See Estate of Moreno., 2020 WL 5740265, at *5 (Ex. 41 to Devlin Decl.); Estate of Hill v. Naphcare, Inc., 2022 WL 1464830, at *10 (E.D. Wash. May 9, 2022).

[156] See note 15 above.

[157] See 2015 Advisory Committee Note to FRCP 37 ("Many court decisions hold that potential litigants have a duty to preserve relevant information when litigation is reasonably forseeable."); see Estate of Hill, 2022 WL 1464830, at *10 ("The duty to preserve relevant evidence must be viewed from the perspective of the party with control of the evidence and is triggered not only when litigation is pending but also when it is reasonably forseeable to that party."). Apple Inc. v. Samsung Electronics Co., 888 F. Supp. 2d 976, 990-991 (N.D. Cal. 2012) ("Although the Ninth Circuit has not precisely defined when the duty to preserve is triggered, trial courts in this Circuit generally agree that, [as] soon as a potential claim is identified, a litigant is under a duty to preserve evidence which is knows or reasonably should know is relevant to the action.").

[158] See note 14 above.

stands in stark contrast to the approach taken by Coos County, which as early as May 2018 stressed the importance of providing information in response to "the continued requests of documentation from plaintiff's attorney."[159]

The Wellpath defendants have argued that Ms. Sauerbry was not identified by name in either the preservation letter or the tort claim notice. There are several problems with this argument. First, the tort claim notice refers to "any employees" who caused the death of Mr. Stewart.[160] Ms. Sauerbry was the only Wellpath employee on duty while Mr. Stewart was in the jail, and she was the only Wellpath employee interviewed by the Oregon State Police. Second, Judge Peterson defaulted Wellpath in the <u>Moreno</u> case for failing to preserve the emails of non-parties, not the named defendant.[161] Third, the Wellpath defendants did not perform the second email purge, which involved the deletion of Ms. Sauerbry's email box, until April 2020. By that date, plaintiff had filed this lawsuit (in November 2019) and the Wellpath defendants had filed their Answer (in January 2020).

2.    *The Wellpath Defendants Failed To Take Reasonable Steps To Preserve The Purged Emails.*

The Wellpath defendants did not place a legal hold on the email boxes of anyone in connection with Mr. Stewart's death. Plaintiff anticipates that the Wellpath defendants will argue that their process was reasonable because the Director of Claims Management

---

[159] See note 101 above.

[160] The tort claim notice also states that Kathy Weaver came to the booking area on the night of Mr. Stewart's death. Anyone familiar with the facts (including Ms. Weaver herself) would have realized that this is describing the actions of Ms. Sauerbry.

[161] See <u>Estate of Moreno</u>, 2020 WL 5740265, at *8 (noting that the purge included the emails of other Wellpath employees "who conducted Mr. Moreno's mortality review") (Ex. 41 to Devlin Decl.).

Page 40 – PLAINTIFF'S MOTION FOR SANCTIONS

asked outside counsel (the Lewis Brisbois firm) to identify open cases in order to "help us ensure key information is not being deleted from the preservation process."[162]

There are multiple problems with this argument. First, the Wellpath Claims Department already had an open claim file related to Mr. Stewart's death.[163] No additional confirmation from outside counsel was necessary to know that information needed to be preserved. Second, the Wellpath defendants have produced no evidence that the Lewis Brisbois firm responded to Wellpath's request.[164] The Wellpath defendants knew that the "failure to respond may result in critical information being deleted * * *."[165] Third, the notice simply stated that Wellpath "is instituting a new Preservation Process"[166] and did not describe the plan for an extensive email purge. This last point is why Judge Peterson rejected this same argument in Moreno: "Nowhere in Defendants' email to Lee Smart[167] do Defendants explain the details of the new policy or their true intentions. The correspondence with Lee Smart does not mention that Defendants planned to permanently delete the emails of any employee or former employee that Lee Smart failed to identify, nor does it ask any questions about the prudence or legality of such a policy."[168]

The second email purge was even less reasonable. As noted above, Wellpath employees specifically discussed the need for legal holds because "there is a lot of scrutiny

---

[162] See note 44 above.
[163] See note 12 above.
[164] See note 51 above.
[165] See note 50 above.
[166] See note 43 above.
[167] The Lee Smart firm was outside counsel for the Moreno case.
[168] Estate of Moreno, 2020 WL 5740265, at *6 (Ex 41 to Devlin Decl.).

on email retention."[169]  Plaintiff's counsel in <u>Moreno</u> already had filed a Motion for Sanctions.  Despite those red flags, the Wellpath defendants failed to place a legal hold on any email box in connection with Mr. Stewart's death.  Instead, they allowed the Wellpath IT Department to delete the email box of Patricia Sauerbry, a named defendant in this then-pending lawsuit.

The 2015 Advisory Committee Notes to FRCP 37 provide guidance on the reasonableness issue:

> As under the current rule, the routine, good-faith operation of an electronic information system would be a relevant factor for the court to consider in evaluating whether a party failed to take reasonable steps to preserve lost information, although the prospect of litigation may call for reasonable steps to preserve information by intervening in that routine operation.  This rule recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection.  The court should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation.

The Wellpath defendants handle lawsuits across the country with an in-house claims department, an in-house legal department, and both local and national outside counsel.  In its 2016 response to Coos County's request for proposals for jail medical services, Wellpath touted its "aggressive litigation defense strategies carried out by an experienced in-house litigation and risk management team."[170] It is hard to imagine a more sophisticated litigant.  There is no excuse for Wellpath's failure to put a legal hold on the email boxes of

---

[169] See note 55 above.
[170] See County 001302 (Ex. 91 to Devlin Decl.).

all individuals involved in Mr. Stewart's death or its key managers of the Coos County Jail medical program.[171]

Wellpath's email preservation policy is unreasonable on its face. Under both Oregon and federal law, health care providers must retain medical records for many years.[172] In addition, the statute of limitations for the types of claims brought in this case is two years.[173] This is consistent with, or in some cases shorter than, the statutes of limitations in other jurisdictions.[174] The routine destruction of all emails after one year inevitably leads to the destruction of evidence in cases like this one.[175] Finally, Oregon has a detailed schedule of records retention timelines for local governments, including multi-year retention periods (some as long as 10 years) for certain types of records.[176]

### 3. The Purged Emails Cannot Be Restored Or Replaced Through Additional Discovery.

Despite the purported efforts by Wellpath to recover the purged emails over the last few months, there is no longer any dispute that those emails are gone forever. The Wellpath defendants knew before the first email purge that the emails would be permanently deleted. Indeed, that was the purpose of the purge. The Chief Legal Officer wrote in a company-

---

[171] See Apple Inc., 888 F. Supp. 2d at 991-992 ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.") (quotation marks and citation omitted).

[172] See OAR 333-505-0050(14) ("Medical records shall be kept for a period of at least 10 years after discharge."); 45 C.F.R. § 316(b)(2) (records that fall under HIPAA must be retained for 6 years).

[173] See Cooper v. City of Ashland, 871 F.2d 104, 105 (9th Cir. 1989) ("Oregon's two-year statute of limitations for personal injury actions applies to actions under 42 U.S.C. § 1983.").

[174] See, e.g., Rose v. Rinaldi, 654 F.2d 546, 547 (9th Cir. 1981) ("[W]e conclude that the applicable period of limitations for Rose's Section 1983 action is three years under R.C.W. 4.16.080(2).").

[175] Coos County, by contrast, clearly saves emails for many years, because it has produced over 3,000 pages of emails in this case. See note 101 above.

[176] See, e.g., OAR 166-150-0135 (Law Enforcement); OAR 166-150-0200 (Risk Management Records).

Page 43 – PLAINTIFF'S MOTION FOR SANCTIONS

wide email: "Once permanently deleted, it is not possible to recover the email. There are no backups or recovery options."[177] A Wellpath Request for Change document stated: "This change will cause aged email that falls outside the retention periods to be permanently deleted. * * * This change will impact results for eDiscovery if the mailbox is NOT on Legal Hold such as with internal employee investigations."[178] In November 2019, a Wellpath IT Security Manager wrote in a declaration that the emails deleted in this process were "permanently purged" and "cannot be recovered electronically through backups or forensic recovery methods."[179]

The Wellpath defendants could have told plaintiff's counsel and the Court about the email purge at the outset of discovery. Instead, plaintiff's counsel negotiated in good faith for many months about search terms that would be run on emails that did not exist. The Wellpath defendants repeatedly referenced the time and expense of sorting through emails that did not exist. The Wellpath defendants made the same arguments to the Court in some of the initial hearings on this issue.

Once plaintiff's counsel realized that the Wellpath defendants had not produced responsive emails that the Coos County defendants had produced, the Wellpath defendants shifted their argument and focused on the alleged time and expense of attempting to recover emails that they knew could not be recovered. The Wellpath defendants made the recovery process seem as complicated and expensive as possible, so that the Court would not order

---

[177] See note 21 above.
[178] See note 24 above.
[179] See RSTE CCS 11538-11540 (Ex. 22 to Devlin Decl.).

Page 44 – PLAINTIFF'S MOTION FOR SANCTIONS

Wellpath to engage in that process. The Wellpath defendants knew that the emails were gone and there was no way to get them back.

The contents of the purged emails cannot be restored or replaced by additional discovery. The Wellpath defendants have purged years of emails from the defendant nurse (Patricia Sauerbry) and the entire management team of the Coos County Jail medical program (Kathi Weaver (HSA), Clint Banning (NP), Dr. Paul Bilder (Site Medical Director), and Dr. Vivek Shah (Regional Medical Director)). Two members of that management team (Dr. Shah and Ms. Weaver) were involved in Wellpath's post-mortem review of Mr. Stewart's death. As the Ninth Circuit has noted, "because the relevance of * * * [destroyed] documents cannot be clearly ascertained because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents."[180]

The testimony of the various Wellpath employees is not a sufficient substitute for several reasons. First, there are clear conflicts between Ms. Weaver and Ms. Sauerbry, suggesting that at least one of them is not a credible witness.[181] Second, there are clear conflicts between Ms. Sauerbry and some of the Coos County deputies (as well as some of

---

[180] See Leon, 464 F.3d at 959 (quotation marks and citations omitted); see also Estate of Moreno, 2020 WL 5740265, at *5 ("[B]ecause Defendants agree that the emails were permanently deleted and the Court finds that no additional discovery can restore the content of those emails, the Court finds that the third Rule 37(e) factor is met as well.") (Ex. 41 to Devlin Decl.).

[181] Ms. Sauerbry testified that Ms. Weaver told her not to do intake screenings if a person was intoxicated or after 9:30 pm. See Sauerbry Dep. at 132-133 (intoxicated), 159-162 (9:30 pm) (Ex. 92 to Devlin Decl.). Ms. Weaver denied making those statements. See Weaver Dep. at 96-97, 103-104 (Ex. 93 to Devlin Decl.). In addition, Ms. Sauerbry testified that she had a "personality conflict issue" with Ms. Weaver that contributed to her departure. See Sauerbry Dep. at 26-31 (Ex. 92 to Devlin Decl.). Ms. Weaver denied that she had any conflict with Ms. Sauerbry. See Weaver Dep. at 60-61 (Ex. 93 to Devlin Decl.).

the video evidence), further casting doubt on Ms. Sauerbry's credibility.[182]   Third, the testimony of another Wellpath witness (Dr. Grady Judson Bazzel) has been called into question by multiple federal judges.[183]   The Wellpath defendants and their witnesses do not deserve the benefit of the doubt.

The litigation misconduct in this case also renders any testimony by the Wellpath defendants inherently suspect.  For example, they repeatedly presented evidence from their IT consultant (Consilio) that was designed to obfuscate the email purges and deter plaintiff's counsel and the Court from inquiring further.   In addition, the Wellpath defendants told this Court in October 2022 that Ms. Weaver only "occasionally" used email and did not use email "to convey clinical information."[184]   In fact, Coos County has produced emails in which Ms. Weaver was communicating about specific patients and administrative responsibilities.[185]   Wellpath has produced a few emails in which Ms. Weaver communicated with other Wellpath employees about clinical information[186] and administrative matters.[187]  As noted above, Ms. Weaver responded to the announcement of

---

[182] Ms. Sauerbry has testified that the deputies never told her that Mr. Stewart was vomiting or even in custody.  See Sauerbry Dep. at 157-158 (Ex. 92 to Devlin Decl.).  Coos County Deputy Mark Mahlum told the OSP detectives that he informed Ms. Sauerbry that Mr. Stewart had been throwing up.  See Devlin Decl., ¶ 4.  Coos County Deputy Cody Libbett documented that Deputy Mahlum gave this information to Ms. Sauerbry and testified that he witnessed the conversation between Deputy Mahlum and Ms. Sauerbry.  See Libbett Dep. at 47-48, 61-63 (Ex. 4 to Devlin Decl.); see also County 000270-271 (Ex. 5 to Devlin Decl.).  In addition, Coos County has produced video from the jail that shows Ms. Sauerbry looking into Mr. Stewart's cell and reviewing paperwork on his door.  See Sauerbry Dep. at 181-183 (Ex. 92 to Devlin Decl.).

[183] See Herriges v. County of Macomb, 2020 WL 4726940, at *4 (E.D. Mich. Aug. 14, 2020) ("Dr. Bazzel's affidavit and testimony raised several red flags about his and CCS's credibility * * *."); see also Marziale v. Correct Care Solutions, LLC, 2020 WL 13421180, at *1 (E.D. Ark. Sep. 23, 2020) ("[T]he Court is cognizant of Dr. Bazzel's shifting testimony from depositions in this and other cases.").

[184] See Defendant Wellpath, LLC, Correct Care Solutions, LLC, and Patricia Sauerbry's Notice and Filing of Affidavit, at 3 (Ex. 81 to Devlin Decl.).

[185] See County 002616-002617 (Ex. 94 to Devlin Decl.).

[186] See RSTE CCS 4451, 4457 (Ex. 95 to Devlin Decl.).

[187] See RSTE CCS 9176-9177 (Ex. 96 to Devlin Decl.).

the email purge by telling the Chief Legal Officer that "I am not sure I have enough room in my system to hold emails for a year."[188]  That evidence casts doubt on Ms. Weaver's deposition testimony regarding her use of email.

This case involves numerous Wellpath policies that are relevant to what happened to Mr. Stewart.  Those policies include the timing of intake screenings, the treatment of people who are intoxicated, and the treatment of people who are vomiting or otherwise need medical attention.  This case also involves the relationship between Ms. Sauerbry and her immediate supervisor (Ms. Weaver), and the relationship between Ms. Sauerbry and the Coos County jail deputies.  Finally, the case involves deficiencies in the post-mortem review process, including the failure to provide critical information to the reviewers.[189] The purged emails also likely contained information relevant to punitive damages.  The contemporaneous emails of Ms. Sauerbry and the Wellpath management team at the jail are invaluable evidence regarding those issues that cannot be replaced.[190]

### B.    The Court Should Find That Wellpath Acted Intentionally.

Federal Rules of Civil Procedure 37(e)(2) states that "only upon finding that the party acted with the intent to deprive another party of the information's use in the

---

[188] See note 22 above.

[189] See <u>Paris v. Conmed Healthcare Management, Inc.</u>, 2017 WL 7310079, at *5 (D. Or. Nov. 28, 2017), <u>adopted by</u> 2018 WL 664807 (D. Or. Jan. 31, 2018) ("[A] jury could conclude from the evidentiary record herein that the M & M Review process, which resulted in the ratification of the health care treatment of Brown as being in compliance with all appropriate Conmed policies and procedures, was tainted by the omission of material information and the submission of materially false information.").  This case involved the death of Donnie Brown in the Coos County Jail in November 2013.  Conmed changed its name to Correct Care Solutions, which is one of the companies that formed Wellpath.

[190] See <u>Estate of Blodgett v. Correct Care Solutions, LLC</u>, 2018 WL 6528109, at *6 (D. Colo. Dec. 12, 2018) (noting that a jail death case involves "an asymmetry of information beyond what is typical in similar cases") (quotation marks and citation omitted).

litigation," a court may "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment."  District courts in the Ninth Circuit "have found that a party's conduct satisfies Rule 37(e)(2)'s intent requirement when the evidence shows or it is reasonable to infer that [the] party purposefully destroyed evidence to avoid its litigation obligations."[191]  One district court described some of the relevant considerations:

> [I]ntent is rarely susceptible to direct proof, and Plaintiffs are not required to produce such direct evidence.  Rather, circumstantial evidence can establish 'intent to deprive' under Rule 37(e)(2).  * * * Courts have found the requisite 'intent to deprive' when a litigant fails to provide a credible explanation for departing from standard operating procedure and intentionally failing to preserve ESI.[192]

In this case, plaintiff has direct evidence of Wellpath's intent.  Wellpath's Chief Information Officer, Robert Martin, admitted that one of the considerations for the email purge was getting rid of bad emails.  This admission played a key role in the <u>Moreno</u> case.[193]  In addition, the Wellpath defendants instituted the second email purge after that admission and after the Motion for Sanctions had been filed in <u>Moreno</u>.  That second email purge was initiated by a Wellpath employee who noticed that "we are not actively removing employee mailboxes who have been terminated long[er] than a year."  That employee said that "[a]utomating this would be helpful and eliminate user error like

---

[191] See <u>Estate of Moreno</u>, 2020 WL 5740265, at *6 (quotation marks and citations omitted) (Ex. 41 to Devlin Decl.).
[192] See <u>Estate of Hill</u>, 2022 WL 1464830, at *12 (quotation marks and citations omitted).
[193] See <u>Estate of Moreno</u>, 2020 WL 5740265, at *6 (noting that Mr. Martin "agreed during his deposition that one of the motivating factors behind Defendants' decision to adopt the new email policy was to destroy bad emails that could be produced in discovery") (Ex. 41 to Devlin Decl.).

missing the periodic removal or missing user mailboxes on accident."[194]   Those quotes make clear that the email purge was not just about data storage but also was about getting rid of potentially harmful emails.[195]   The second email purge also happened after another employee warned: "Please do NOT simply delete the aged boxes * * * .  Now that we've deleted old email there is a lot of scrutiny on email retention."[196]

In addition, Wellpath has provided no credible explanation for failing to put a legal hold on the relevant email boxes.  They did not follow up when they failed to receive the information from the Lewis Brisbois firm.  They did not examine their own claims files to see what claims existed in Oregon.  A Wellpath internal document stated that the purge "will impact results for eDiscovery if the mailbox is NOT on Legal Hold * * * ."[197]  Even after the first purge came to light in <u>Moreno</u>, they did no additional due diligence before deleting Ms. Sauerbry's email box during the second purge.  By that point, Ms. Sauerbry was a named defendant in this case.

There is also overwhelming circumstantial evidence of Wellpath's intent to deprive plaintiff of the use of these emails in litigation.

<u>First</u>, Wellpath's failure to disclose the purge for more than two years is probative of its intent.  The Wellpath defendants hoped that plaintiff's counsel would not discover the purge.  If the emails were deleted as a result of a standard email preservation policy

---

[194] See note 54 above.
[195] The cost savings was a drop in the bucket compared to Wellpath's annual revenues.  See notes 41-42 above.  In addition, Coos County has far fewer resources but is able to retain emails for years.
[196] See note 55 above.
[197] See note 24 above.

and a negligent failure to implement a litigation hold, then a contrite defendant would have admitted those facts to plaintiff's counsel and to the Court immediately. As noted above, Wellpath had all of the relevant facts when it submitted its initial response to plaintiff's Request for Production in September 2020. Instead, the Wellpath defendants tried every possible strategy to avoid admitting what they had done.[198] If plaintiff's counsel had not discovered the discrepancy between Wellpath's email production and Coos County's email production, Wellpath likely would have succeeded. Wellpath failed to disclose its email purge policy in other cases that predate its actions in this case.[199] Wellpath clearly was not deterred by the outcomes of those cases.

Second, Wellpath's behavior on the email issue is consistent with its other litigation tactics in this case. For example, the Wellpath defendants finally produced Parts I and II of its Mortality & Morbidity Report and Review ("M&M Report") on July 19, 2022.[200] Plaintiff first requested documents related to Mr. Stewart in June 2018.[201] Wellpath's then-counsel (the Lewis Brisbois firm) responded that Wellpath "has no documents related to Mr. Stewart."[202] Plaintiff served his First Request for Production, which asked for a copy

---

[198] See In re Bane, 2010 WL 6451886, at *7 (9th Cir. B.A.P. Jan. 15, 2020) ("Other courts have considered a subsequent cover-up of a conversion as probative of a debtor's intent.").

[199] See Moreno, 2020 WL 5740265, at * 10 ("Defendants failed to notify Plaintiffs and the Court of the spoliation for approximately eight months while this litigation was ongoing. Rather than telling Plaintiffs or the Court what had occurred, Defendants misled Plaintiffs by promising to provide responsive emails at a later date.") (Ex. 41 to Devlin Decl.); see also Nall v. Correct Care Solutions, LLC, 2020 WL 4597288, at *4 (W.D. Wash. Aug. 11, 2020) ("Wellpath failed to give a complete response to the request because it failed to disclose the pertinent information regarding its document retention plan – a plan which may have caused the emails related to the event to be deleted."), clarified by 2020 WL 13577265 (W.D. Wash. Aug. 31, 2020); Marziale, 2020 WL 4744859, at *5 (noting that plaintiff's counsel "first learned of the February 2019 CCS retention policy" when Judge Peterson issued the Moreno ruling in June 2020).

[200] See note 8 above.

[201] See note 17 above.

[202] See note 18 above.

of all investigations into Mr. Stewart's care and treatment, including any M&M Reports, in July 2020.[203]  In August 2021, counsel for the Wellpath defendants responded that "Wellpath has no responsive documents."[204]

In January 2022, plaintiff's counsel informed the Court that one disputed FRCP 30(b)(6) deposition topic involved why no M&M Report was done in this case.[205]  Counsel for the Wellpath defendants told the Court by email: "Why a post-mortem review was or was not done is irrelevant.  The absence of a post-mortem analysis also is not admissible."[206]  During the January 2022 hearing, counsel for the Wellpath defendants told the Court: "And, you know, why there was no postmortem review, I mean – I mean, I was very honest in our response.  This guy died, and the only way to find out how this guy died was to do an autopsy.  Wellpath can't do an autopsy on this guy.  That was – that's what the State did."[207]

In March 2022, during the deposition of Kathleen Weaver, plaintiff's counsel learned for the first time that Wellpath had done an M&M Report related to Mr. Stewart's death.[208]  As noted above, the Wellpath defendants finally produced Parts I and II of the M&M Report four months later, shortly before the 30(b)(6) deposition where the M&M Report would be discussed.[209]  Parts I and II of the M&M Report were prepared by Ms.

---

[203] See note 70 above.
[204] See note 73 above.
[205] See note 80 above.
[206] See note 82 above.
[207] See January 27, 2022 transcript, at 30 (Ex. 58 to Devlin Decl.).
[208] See Weaver Dep. at 124-128 (Ex. 93 to Devlin Decl.).
[209] Wellpath produced the M&M Report on July 19, 2022.  The 30(b)(6) deposition took place on July 27, 2022.

Weaver and are critical documents in this case.  As a result, plaintiff had to take a second deposition of Ms. Weaver on February 24, 2023.

Wellpath still has not produced Part III of the M&M Report, which lays out the recommendations of the M&M Review process.[210]  In November 2022, new counsel for the Wellpath defendants told plaintiff's counsel that Wellpath did not complete Part III.  In February 2023, plaintiff's counsel asked counsel for the Wellpath defendants to confirm that fact.[211]  In response, counsel for the Wellpath defendants wrote: "I have not seen a Part III, and I understand no Part III has been located by Wellpath."[212]  The parties then conferred about the inadequacy of this response, and the Wellpath defendants produced another document related to the post-mortem review.[213]  This document was prepared by Dr. Vivek Shah (the Regional Medical Director) and is responsive to plaintiff's June 2018 records request and July 2020 Request for Production.  The Wellpath defendants only produced it after repeated, detailed requests from plaintiff's counsel and only on the eve of Ms. Weaver's second deposition.

During that second deposition, Ms. Weaver testified that she likely did complete Part III of the M&M Report for Mr. Stewart, because she completed Part III for all of the in-custody deaths while she was the HSA at the Coos County Jail.[214]  She explained that she would either fax or email Part III to Wellpath's CQI department and would not keep a

---

[210] The Wellpath defendants have produced a blank Part III form, which demonstrates the type of information found on the form.  See Ex. 97 to Devlin Decl.
[211] See February 20, 2023 email from Paul Galm to Jens Schmidt (Ex. 98 to Devlin Decl.).
[212] See February 20, 2023 email from Jens Schmidt to Paul Galm (Ex. 98 to Devlin Decl.).
[213] See February 23, 2023 email from Jens Schmidt to Paul Galm (Ex. 99 to Devlin Decl.).
[214] The transcript of this deposition is not yet available.

Page 52 – PLAINTIFF'S MOTION FOR SANCTIONS

copy (as directed by Wellpath's policy).[215]  Wellpath's 30(b)(6) witness explained that the M&M Reports "are housed in our CQI protected information, as well as a copy being sent for archival at our corporate office."[216]  Thus, Wellpath's CQI department and its corporate office should have a copy of Part III of the Rocky Stewart M&M Report.  Wellpath has not provided any credible explanation for why it cannot locate this document.

If Wellpath had retained all of its emails, it is likely that plaintiff could have recovered Part III of the M&M Report.  This is just one of many examples of prejudice and of why Wellpath should not have a one-year email purge policy.

Another example of Wellpath's bad faith is its failure to engage in other routine discovery activities.  More than two years after plaintiff served his initial Requests for Production, new counsel for the Wellpath defendants told the Court that there were "approximately 60 banker's boxes in the Coos County jail [that] have not been fully reviewed."[217]  On December 2, 2022, the Wellpath defendants produced over 9,000 pages of documents.  The Wellpath defendants had no good faith basis for failing to turn over those documents for two years and before numerous depositions were taken.  The Wellpath defendants chose not to perform the basic tasks necessary to respond to plaintiff's discovery requests.

The Wellpath defendants took a similar approach to plaintiff's Requests for Admission and Interrogatories.  The Wellpath defendants initially responded to those

---

[215] See RSTE CCS 0532 ("At final conclusion of review process destroys local copies of Mortality Review") (Ex. 9 to Devlin Decl.).
[216] See Cornelius Dep. at 134 (Ex. 100 to Devlin Decl.).
[217] See note 135 above.

discovery requests in January 2022.  During an August 2022 conferral conference, counsel for the Wellpath defendants agreed to follow up on 17 inadequate RFA responses and 7 inadequate interrogatory responses by September 9, 2022.[218]  At the September 15, 2022 status conference with the Court, counsel for the Wellpath defendants agreed to a revised deadline of October 6, 2022.[219]  At the October 6, 2022 status conference with the Court, counsel for the Wellpath defendants agreed to a revised deadline of October 31, 2022.[220]  Plaintiff's counsel did not receive the supplemental responses until Wellpath's new counsel provided them in mid-December 2022.  Again, the Wellpath defendants had no good faith basis for failing to provide sufficient answers for almost a year.

Third, Wellpath's behavior in this case is consistent with its behavior in cases across the country.  Judge Peterson noted in Moreno that "[t]his litigation has been hindered significantly by Defendants' failure to provide responsive discovery and their failure to admit in a timely fashion to their destruction of evidence."[221]  Eight years ago, a federal judge in New York was dealing with the same difficulties in getting Correct Care Solutions to produce responsive emails:

> The Court has no idea whether an appropriate document retention hold was put in place, though it is aware of counsel's representation at the conference in July 2015 that it was.  The Court also has no idea as to whether once the hold was put in place, any emails that may have existed continued to exist, or were deleted.  Just how many emails, and the importance (or lack of importance) of any unproduced emails is also unknown.

---

[218] See August 18, 2022 email from Josh Lamborn to Bruce Smith (Ex. 101 to Devlin Decl.).
[219] See September 15, 2022 transcript, at 22-23 (Ex. 78 to Devlin Decl.).
[220] See October 6, 2022 transcript, at 23 (Ex. 82 to Devlin Decl.).
[221] See Estate of Moreno, 2020 WL 5740265, at *8 (Ex. 41 to Devlin Decl.); see also id. at *10 ("Defendants failed to notify Plaintiffs and the Court of the spoliation for approximately eight months while this litigation was ongoing. Rather than telling Plaintiffs or the Court what had occurred, Defendants misled Plaintiffs by promising to provide responsive emails at a later date.").

But here we are in mid-October and we still are not at the bottom of all this. This issue should long ago have been resolved.  * * * It seems that there is an avoidance of doing that which defendants are required to do – and this troubles the Court.  If the reason is that defendants do not take this issue seriously, then defendants should understand that this is a view not shared by this Court.  To the extent that there has been no spoliation, so much the better – but defendants should realize that the fact that this Court has now had to address this issue yet again, and issue an order yet again, means that this Court's concern as to spoliation is higher than it used to be, not lower.[222]

Multiple federal judges have made similar comments about Wellpath's litigation tactics.[223]  Others have questioned the credibility of Wellpath's Patient Safety Officer in connection with Wellpath's efforts to invoke privilege for post-mortem reviews.[224]  In 2018, a federal judge in Colorado denied a motion to dismiss brought by a doctor who alleged that one of Wellpath's predecessor companies (Correct Care Solutions) fired him after he testified in a federal civil rights case that he would have sent the plaintiff to the hospital if the nurse had called him.[225]

Plaintiff anticipates that the Wellpath defendants might seek to blame Wellpath's prior counsel (the Lewis Brisbois firm) for some or all of the problems in this case.  The

---

[222] See Rembert v. Cheverko, 2015 WL 5918185, at *4 (S.D.N.Y. Oct. 9, 2015).

[223] See Order, Early v. State of Arizona, et al., Case No. CV 16-00031-PHX-SPL (D. Ariz. May 22, 2018) (sanctioning one of Wellpath's predecessors for denying the existence of nursing protocols that its own witnesses described during depositions) (Ex. 102 to Devlin Decl.); Order, Brogdon v. Correct Care Solutions, et al., Case No. 1:16-cv-12 (W.D. Pa. May 9, 2017) (sanctioning one of Wellpath's predecessors because records sought by the plaintiff were no longer available after long discovery delays) (Ex. 103 to Devlin Decl.); Marziale v. Correct Care Solutions, LLC, 2021 WL 1423277, at *3 (E.D. Ark. Jan. 27, 2021) ("[P]erhaps most troubling, are the repeated representations by counsel for CCS that all discovery material had been produced when, in fact, those representations were untrue."), adopted by 2021 WL 1030978 (E.D. Ark. Mar. 17, 2021); Marziale, 2020 WL 4744859, at *5-*6 ("CCS repeatedly failed to produce responsive discovery documents; failed to preserve evidence; and failed to faithfully comply with the Court's discovery orders.  * * * In this case, CCS has thrown sand in the gears by violating the spirit of the rules and, in some instances, directly violating both rules and court orders.").

[224] See note 183 above.

[225] See Brill v. Correct Care Solutions, LLC, 286 F. Supp. 3d 1210, 1214 (D. Colo. 2018).

Court should reject that argument. The Lewis Brisbois firm did not plan and execute either of the email purges – Wellpath did. The Lewis Brisbois firm was not involved in the <u>Moreno</u> case or the other cases cited above – the only common factor is Wellpath. This Court should find that Wellpath has a nationwide litigation strategy of delaying discovery, denying bad conduct, and destroying evidence.

    <u>Fourth</u>, Wellpath's email purge has impacted other cases pending in this Court. Janelle Butterfield died by suicide in the Josephine County Jail on September 5, 2018. Plaintiff's counsel sent a tort claim notice to Wellpath in July 2019.[226] The Wellpath Claims Department opened a claim related to Ms. Butterfield's death on July 24, 2019.[227] As in this case, however, Wellpath did not place a legal hold on any email boxes related to Ms. Butterfield's death.[228] Ms. Butterfield's estate filed a lawsuit on April 22, 2020.[229] Wellpath has acknowledged that the emails of six individual defendants were subject to the same email purges prior to the August 2020 company-wide pause.[230] As a result, the emails of four former employees, all of whom left between August 2018 and April 2019, were deleted in their entirety. All or almost all of the emails of two current employees likely were deleted through August 2019 (one year prior to the pause).

---

[226] See July 10, 2019 letter from John Devlin to Wellpath LLC, et al. (Ex. 104 to Devlin Decl.).
[227] See RSTE CCS 11516 (Ex. 12 to Devlin Decl.).
[228] See <u>id.</u>
[229] Complaint for Violation of Civil Rights (42 USC § 1983) and Supplemental State Law Claims, <u>Estate of Butterfield v. Wellpath, et al.,</u> Case No. 1:20-cv-00671-CL (Ex. 105 to Devlin Decl.).
[230] See February 27, 2023 letter from Jens Schmidt to John Devlin (Ex. 106 to Devlin Decl.).

### C. The Court Should Enter A Default Judgment Against The Wellpath Defendants.

In <u>Leon v. IDX Systems Corp.</u>, the Ninth Circuit laid out several factors for the Court to consider before entering a default judgment: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."[231]  The Ninth Circuit has emphasized that application of these factors "is not mechanical.  It provides the district court with a way to think about what to do, not a set of conditions precedent for sanctions or a script that the district court must follow * * *."[232]

  *1.  The public's interest in expeditious resolution of litigation*

  *2.  The court's need to manage its dockets*

These factors strongly favor entry of a default judgment.  In <u>Moreno</u>, Judge Peterson analyzed these factors together and noted that "[t]his litigation has been hindered significantly by Defendants' failure to provide responsive discovery and their failure to admit in a timely fashion to their destruction of evidence.  * * * [T]he fact that Defendants had provided so few emails was a source of confusion and concern for months."[233]  Other courts have cited the same type of behavior when entering a default judgment.[234]

---

[231] See <u>Leon</u>, 464 F.3d at 958.

[232] See <u>Connecticut General Life Insurance Co. v. New Images of Beverly Hills</u>, 482 F.3d 1091, 1096 (9th Cir. 2007).

[233] See <u>Moreno</u>, 2020 WL 5740265, at * 8 (Ex. 41 to Devlin Decl.).

[234] See <u>Leon</u>, 464 F.3d at 958 n.5 ("Here, there was ample evidence of the time and resources spent in investigating and resolving the spoliation issues."); <u>Estate of Hill</u>, 2022 WL 1464830, at *13 ("Here, the expeditious resolution of this litigation has been impeded by the spoliation, which has engendered depositions and motion practice which would not otherwise be necessary, in turn requiring the expenditure of party and judicial resources which would otherwise be put to different use.").

This case is far worse than Moreno. As noted above, Wellpath's two email purges and its failure to disclose those purges have caused years of delay. The parties spent months in 2021 and 2022 negotiating email search parameters. The Court held seven status conferences about email discovery in 2022, essentially putting the case schedule on pause until this issue was resolved. During those conferences, the Wellpath defendants failed to inform the Court or plaintiff's counsel about the email purges and instead made a series of arguments designed to deter further investigation. That conduct took place after Judge Peterson entered a default judgment in Moreno. Instead of learning from what happened in that case, Wellpath again failed to disclose the email purges.

The public, the Court, and the parties have an interest in the expeditious resolution of cases. Rocky Stewart died in December 2017. His family has been waiting for justice for more than five years. Since his death, there have been two other deaths in the Coos County Jail, and numerous other deaths in Oregon jails where Wellpath provides the medical care. The civil justice system cannot function, and accountability cannot happen, when a defendant refuses to participate in litigation in good faith.

> 3.    *The risk of prejudice to the party seeking sanctions*
>
> 4.    *The public policy favoring disposition of cases on the merits*
>
> 5.    *The availability of less drastic sanctions*

These factors also strongly favor entry of a default judgment. In Moreno, Judge Peterson analyzed these factors together and explained:

> In deciding whether to impose case-dispositive sanctions, the most critical factor is not merely delay or docket management concerns, but truth. In other

Page 58 – PLAINTIFF'S MOTION FOR SANCTIONS

words, [w]hat is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations threaten to interfere with the rightful decision of the case. Where a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts, a case dispositive sanction may be appropriate.[235]

**Prejudice.** As in <u>Moreno</u>, Wellpath has purged the emails of the person "who worked [at the jail] while [Mr. Stewart] was confined" and "the emails of the employees who conducted [the] mortality review."[236] As in <u>Moreno</u>, Wellpath "destroyed" the emails of a nurse who left the company after the death.[237] In fact, this case is worse than <u>Moreno</u>, because Wellpath preserved the emails of the named defendant nurse in <u>Moreno</u>.[238] Judge Peterson sanctioned Wellpath for the deletion of non-party emails, noting that "[w]hile nobody can know the information contained in the destroyed emails, the breadth of the destruction is stunning. These emails cannot be constructed for Plaintiffs, or the factfinder, to review."[239] As set forth above, the emails destroyed by Wellpath potentially related to many issues in this case. Plaintiff has suffered severe prejudice that cannot be undone.

If the Wellpath defendants argue that the email purges caused little or no prejudice, this Court should reject that argument for the same reasons that Judge Peterson rejected it:

> While the Court cannot speculate as to whether the information contained in the destroyed communications would have bolstered Plaintiffs' case, the Court finds that contemporaneous emails about Defendants' operations and practices, as well as any other emails related to Mr. Moreno's confinement and subsequent death, would have been invaluable to Plaintiffs as they

---

[235] See <u>Moreno</u>, 2020 WL 5740265, at *8 (quotation marks and citation omitted) (Ex. 41 to Devlin Decl.); see also <u>Estate of Hill</u>, 2022 WL 1464830, at *14 (quoting same language); <u>OmniGen Research</u>, 321 F.R.D. at 371 (quoting some of the same language).
[236] See <u>Moreno</u>, 2020 WL 5740265, at *8 (Ex. 41 to Devlin Decl.).
[237] See <u>id.</u>
[238] See <u>id.</u>
[239] See <u>id.</u>

shaped their case theory and engaged in discovery. Additionally, the communications almost certainly would have been useful for the examination of defense witnesses, both during depositions and at trial.[240]

Judge Peterson noted that Wellpath's lack of prejudice argument was "speculative and offensive to the integrity of the judicial system, which requires an exchange of information for a neutral factfinder to consider before arriving at a conclusion. Accordingly, the Court rejects the argument that Defendants can destroy a startling amount of discovery while litigation is ongoing, then defend against discovery sanctions by arguing that the spoliation likely benefitted Plaintiffs."[241]

Wellpath's Chief Information Officer, Robert Martin, acknowledged that Wellpath implemented the purge policy in part to get rid of bad emails. A Wellpath internal document stated that the purge "will impact results for eDiscovery if the mailbox is NOT on Legal Hold * * * ."[242] These are admissions that Wellpath knew, and still knows, that the email purge prejudiced plaintiffs.

**Public policy.** Courts often acknowledge that this factor, "which considers the strong public policy of deciding cases on their merits," typically weighs against dispositive sanctions.[243] In Moreno, however, Judge Peterson noted that "Defendants' destruction of countless email communications between its employees in this case threaten[s] to interfere with the rightful decision of the case such that a trial on the merits of Plaintiffs' Monell

---

[240] See id. at *9.
[241] See id.; see also Leon, 464 F.3d at 959 ("[B]ecause the relevance of * * * [destroyed] documents cannot be clearly ascertained because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents.") (quotation marks and citation omitted).
[242] See RSTE CCS 11541-11542 (Ex. 20 to Devlin Decl.).
[243] See Moreno, 2020 WL 5740265, at *9 (Ex 41 to Devlin Decl.).

claim no longer is possible."[244]  As a result, this factor "does not weigh heavily against dispositive sanctions here."[245]

Extreme misconduct warrants severe sanctions, which are designed to deter future bad behavior.  If a defendant can destroy evidence and attempt to conceal that activity from the Court without suffering a default, then how can the civil justice system function?

**Lesser sanctions.**  Given the extent of the email purge, no lesser sanction would be appropriate in this case.  In <u>Moreno</u>, Judge Peterson rejected a lesser sanction because

> due to the significance of the erased emails to Plaintiffs' <u>Monell</u> claims, the breadth of information covered by those emails, and the potential that the content of those emails would have helped Plaintiffs much more than a presumption, a jury instruction is insufficient to remedy the risk of prejudice to Plaintiffs.  The Court agrees with Plaintiffs' assertion that, unlike cases where specific documents were destroyed, it is not feasible to draft an instruction that conveys or remedies the scope of the harm that Defendants have caused here.[246]

In addition, because Wellpath implemented the email purges before discovery in this case got underway, this Court did not have an opportunity to try lesser sanctions or warn Wellpath about its conduct.[247]  Those efforts likely would have been futile, because Wellpath implemented the second email purge after being on notice in the <u>Moreno</u> case

---

[244] See <u>id.</u>

[245] See <u>id.</u> at *9; see also <u>Estate of Hill</u>, 2022 WL 1464830, at *15 ("[S]poliation of evidence such as the video surveillance in this case poses challenges to disposing of the case on the merits given the lack of access to evidence that could shed light on the events that took place.  Therefore, the Court finds that this factor weighs only slightly, if at all, against default judgment in this case.").

[246] See <u>Moreno</u>, 2020 WL 5740265, at *10 (Ex. 41 to Devlin Decl.); see also <u>Leon</u>, 464 F.3d at 960 (noting that an adverse inference instruction "would leave [the innocent party] equally helpless to rebut any material that [the spoliating party] might use to overcome the presumption").

[247] See <u>Leon</u>, 464 F.3d at 960 (discussing court's lack of opportunity to try lesser sanctions or issue a warning).

Page 61 – PLAINTIFF'S MOTION FOR SANCTIONS

and because Wellpath failed to disclose its email purges in this case.[248]  Wellpath knew what it was doing – no warning would have changed its plan.

That leads to an additional factor cited by Judge Peterson in <u>Moreno</u> – the "continued deceptive misconduct" of Wellpath.[249]  The phrase comes from a Ninth Circuit case discussing when to impose dispositive sanctions:

> Sometimes courts respond to contumacious refusal to produce required discovery or comply with orders compelling discovery with suggestions that lawyers 'quit squabbling like children' and work things out for themselves. That can operate to the advantage of a dishonest, noncompliant party, and can prevent the truth from coming out.  Federal Rule of Civil Procedure 1 requires that the rules be construed to secure the 'just' resolution of disputes. 'There is no point to a lawsuit, if it merely applies law to lies.'  The most critical factor to be considered in case-dispositive sanctions is whether 'a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts.'  Dickson's 'pattern of deception and discovery abuse made it impossible for the district court to conduct another trial with any reasonable assurance that the truth would be available.  It is appropriate to reject lesser sanctions when the court anticipates continued deceptive misconduct."[250]

Judge Peterson summarized Wellpath's bad conduct in her conclusion:

> Defendants repeatedly failed to provide responsive discovery to Plaintiffs, even after being compelled to do so by this Court, such that the Court found Defendants in contempt of its April 2019 Order.  Similarly, Defendants failed to notify Plaintiffs and the Court of the spoliation for approximately eight months while this litigation was ongoing.  Rather than telling Plaintiffs or the Court what had occurred, Defendants misled Plaintiffs by promising to provide responsive emails at a later date.  Due to the way that Defendants have conducted themselves over the course of this litigation, the Court finds that lesser sanctions are not warranted.[251]

---

[248] The Supreme Court noted that "[i]t is quite reasonable to conclude that a party who has been subjected to [a dismissal] order will feel duly chastened * * * ."  <u>National Hockey League v. Metropolitan Hockey Club, Inc.</u>, 427 U.S. 639, 642-43 (1976).  Wellpath's behavior in this case make clear that it was not chastened at all by Judge Peterson's entry of a default judgment.

[249] See <u>Moreno</u>, 2020 WL 5740265, at *10 (Ex. 41 to Devlin Decl.).

[250] See <u>Connecticut General Life Ins. Co.</u>, 482 F.3d at 1097.

[251] See <u>Moreno</u>, 2020 WL 5740265, at *10 (Ex. 41 to Devlin Decl.).

Wellpath has behaved the same way in this case. Wellpath ignored multiple preservation warnings and implemented the first email purge. Wellpath doubled down after the issue arose in <u>Moreno</u> and implemented the second email purge. Wellpath then failed to disclose those purges for more than two years. This Court repeatedly admonished Wellpath's counsel about its expectations regarding discovery during last year's hearings:

- **<u>April 2022:</u>** "I'm very unhappy that you made the report that – about the work you've done to try to get cooperation with the [Wellpath] defense counsel and defendants. And it seems like they didn't get my message. * * * This is – there's no excuse for, frankly, this behavior. I'm really unhappy about it."[252]

- **<u>July 2022:</u>** "This is not acceptable, period, especially when 3,000 pages of email was provided by the County that shows there was responses that are relevant and that Wellpath was on notice in May of 2018 to save those emails with regard to litigation. * * * I won't tolerate it, and you're on notice, and it's professionally unacceptable, period. * * * This is inexcusable in this kind of litigation. Inexcusable. * * * I feel like you've been playing with us. And I'm not going to tolerate it. * * * I thought I got across to Mr. Smith two or three conferences ago what was expected. So today is stunning to me."[253]

- **<u>October 2022:</u>** "I am very unhappy. * * * I'm very disturbed in how this has been handled. I think I have been clear at every hearing that I expect much better professionalism and candidness and effort with the Court."[254]

Despite all of these admonishments, the Wellpath defendants did not disclose what they had done until they had no choice because of the persistence of plaintiff's counsel. All of those hearings took place after Judge Peterson had entered the default judgment in <u>Moreno</u>, which demonstrates Wellpath's lack of remorse. In addition, as noted above, Wellpath repeatedly failed to disclose the existence of the M&M Report, which only came to light

---

[252] See April 11, 2022 transcript, at 6-7, 9-10 (Ex. 68 to Devlin Decl.).
[253] See July 29, 2022 transcript, at 6-11 (Ex. 76 to Devlin Decl.),
[254] See October 6, 2022 transcript, at 22 (Ex. 82 to Devlin Decl.).

during a witness deposition and still remains incomplete.  This is the type of misconduct that requires the entry of a default judgment.

Almost fifty years ago, the Supreme Court noted that "here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."[255]  Wellpath has earned the sanction of a default judgment through its conduct in this case.  Allowing Wellpath to proceed would empower it and other parties to ignore their obligations under existing caselaw and the Federal Rules of Civil Procedure.

### D.    The Court Also Has Inherent Authority To Sanction Wellpath.

As an alternative basis for sanctioning the Wellpath defendants, the Court can rely on its "inherent power to levy sanctions in response to abusive litigation practices."[256]  The Ninth Circuit has explained that "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."[257]  A party's destruction of evidence "qualifies as willful spoliation if the party has some notice that the documents were *potentially* relevant to the litigation before they were destroyed."[258]

---

[255] See National Hockey League, 427 U.S. at 643.
[256] See Moreno, 2020 WL 5740265, at *10 (Ex. 41 to Devlin Decl.).
[257] See Leon, 464 F.3d at 958 (quotation marks and citation omitted).
[258] See id. at 959 (quotation marks and citation omitted); see also OmniGen Research, 321 F.R.D. at 371 (quoting same standard).

Page 64 – PLAINTIFF'S MOTION FOR SANCTIONS

For all the reasons set forth above, the Court should conclude that Wellpath's email purges were willful. Wellpath had ample notice that those emails were potentially relevant to litigation related to Mr. Stewart's death.[259]

## **CONCLUSION**

For the reasons set forth above, the Court should enter a default judgment against defendants Wellpath, LLC; Correct Care Solutions, LLC; and Patricia Sauerbry.

DATED this 10th day of March, 2023.

PAUL GALM ATTORNEY AT LAW, LLC

/s/ Paul Galm
Paul Galm, OSB No. 002600
Email: paul@paulgalmlaw.com

THE LAW OFFICE OF JOSH LAMBORN, PC

/s/ Josh Lamborn
Josh Lamborn, OSB No. 973090
Email: jpl@pdxinjury.com

DEVLIN LAW, P.C.

/s/  John Devlin
John Devlin, OSB No. 042690
Email: john@johndevlinlaw.com

Of Attorneys for Plaintiff

---

[259] See Moreno, 2020 WL 5740265, at *10 ("[T]he Court finds that Defendants had notice that their employees' emails were potentially relevant to this litigation prior to destroying them.") (Ex. 41 to Devlin Decl.).