IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

DEREK JOHNSON, personal                          Civ. No. 6:19-cv-01883-AA
Representative for the Estate of
Rocky Stewart, Deceased

              Plaintiff,                        **OPINION & ORDER**
    v.

COOS COUNTY; WELLPATH, LLC;
CORRECT CARE SOLUTIONS, LLC;
SAMUEL ELEY; PATRICIA SAUERBRY;
JIMMY LAY; ROBERT KRAMER;
MARK MAHLUM; JOHN DOES 1-9,,

              Defendants.
_____

AIKEN, District Judge.

    This case comes before the Court on Plaintiff's Motion for Sanctions against Defendants

Wellpath, LLC, Correct Care Solutions, LLC, and Patricia Sauerbry (collectively "the Wellpath

Defendants"). ECF No. 96. The Court heard oral argument on June 6, 2023. ECF No. For the

reasons set for the below, Plaintiff's Motion is GRANTED.

## BACKGROUND

    Rocky Stewart was booked into the Coos County Jail at 8:22 p.m. on December 2, 2017.

At the time, Wellpath had a contract to provide medical services for inmates at the jail.

Defendant Patricia Sauerbry, a nurse, was the only Wellpath employee on duty at the time.

Under a contract between Wellpath and Coos County, Wellpath nurses are supposed to perform

intake medical screenings of inmates as soon as possible.  Sauerbry did not perform a medical intake screening of Rocky Stewart before leaving the jail at the end of her shift.

Rocky Stewart was found dead in his cell at 5:30 a.m. on December 3, 2017.  Oregon State Police investigated and interviewed witnesses, including Sauerbry.

Kathleen Weaver was Sauerbry's supervisor with Wellpath at the Coos County Jail.  In the aftermath of Rocky Stewart's death, Weaver participated in meetings with Wellpath and County employees concerning the death and participated in a Mortality and Morbidity Review ("M&M Review").  These meeting was also attended by Wellpath's regional leadership and staff from the Coos County Sheriff's Office.

On March 8, 2018, counsel for Mr. Stewart's family sent an evidence preservation letter to counsel for Coos County and counsel for the Wellpath Defendants.  The Wellpath Defendants have admitted to receipt of this letter.

On April 19, 2018, Wellpath's claims department opened a claim related to Mr. Stewart's death, but Wellpath did not place a litigation hold on any email accounts in connection with the claim.

In May 2018, counsel for Mr. Stewart's estate sent a tort claim notice to Coos County and Wellpath.  The Wellpath Defendants admit that they received this tort claim notice but Wellpath did not place a litigation hold on any email accounts in connection with the claim.

On June 20, 2018, counsel Mr. Stewart's estate sent a request to Wellpath for all documents in Wellpath's custody related to Mr. Stewart's death.  On August 30, 2018, an attorney representing Wellpath responded that it had no documents related to Mr. Stewart, despite Wellpath's possession of documents connected to the M&M Review of Mr. Stewart's death.

## A. The First Email Purge

On March 8, 2019, Wellpath's Chief Legal Officer David Perry sent a company-wide email announcing changes to Wellpath's email system. Under the changes, most emails would only be retained for one year and then permanently deleted. Emails put on a legal hold by the corporate legal department would be retained until the legal hold was reviewed. The email warned that "[o]nce permanently deleted it is not possible to recover the email. There are no backups or recovery options." Devlin Decl. Ex. 18. ECF No. 96-20. Weaver responded to the Perry to ask if they should refrain from deleting emails and told him that "I am not sure I have enough room in my system to hold emails for a year." Devlin Decl. Ex. 19. Weaver's email was forwarded to Wellpath's IT help desk.

A Wellpath "Request for Change" document noted that implementation of the changes was slated for March 6 through March 31, 2019 and reported that emails that fell outside of the retention period would be permanently deleted and email backups and archives would also be permanently deleted. "This change will impact results for eDiscovery if the mailbox is NOT on Legal Hold such as with internal employee investigations." Devlin Decl. Ex. 20.

On December 18, 2019, Wellpath's Chief Information Officer Robert Martin testified at a deposition for *Estate of Moreno et al. v. Correctional Healthcare Companies, Inc., et al.*, Case No. 18-cv-05171 (E.D. Wash.) concerning the email purge policy. Devlin Decl. Ex. 21. In that deposition, Martin testified that, prior to early 2019, all emails were retained and that, following the changes, an email and its backups would be destroyed after a year unless the email was subject to a litigation hold. *Id.* at 5. Martin testified that it was not possible to recover destroyed emails. *Id.* at 6. Martin testified that the new retention policy was adopted in response to "costs and risks" and, when questioned on the risks associated with retaining the emails, Martin

responded that there were "discovery risks," such as the case in which he was being deposed. *Id.* When asked about why the company did not simply continue retaining emails, Martin responded that it was costly "[a]nd the information contained in that—in emails can be good or bad, right, depending on many, many factors." *Id.*

Martin was asked "Was it part of the motivation of CCS and CHC and Wellpath in early 2019 that there should be a system in place to automatically delete older emails in case, for example, there were any bad emails out there?" Martin replied "I wouldn't say that was a primary consideration but it's certainly a consideration," and added that it was a factor Wellpath considered when implemented the email retention policy. Devlin Decl. Ex. 21, at 6-7. Martin confirmed that "millions of email" were destroyed in the email purge. *Id.* at 10.

### B. Failure to Hold the Emails and the Commencement of this Case

On January 9, 2019, Wellpath emailed its outside counsel to advise them of the new email retention policy and directing them to identify each open case assigned to their office and the names of Wellpath employees named in those lawsuits or who could be considered key witnesses. Devlin Decl. Ex. 26.

On January 16, 2019, Wellpath's prior counsel in this case responded to the January 9 email to inform Wellpath that it would send Wellpath the information on open cases that day. Devlin Decl. Ex. 29. It is not clear whether Wellpath received the list. In responses to Plaintiff's counsel, Wellpath's counsel indicated that it relied on its prior counsel to identify the email records associated with this case. Devlin Decl. Ex. 31, at 3.

Plaintiff filed this action on November 21, 2019, naming Wellpath, Correct Care Solutions, LLC, and Sauerbry as Defendants. ECF No. 1. On January 21, 2020, the Wellpath Defendants filed their Answer and Affirmative Defenses. ECF No. 21.

### C. **Wellpath's Second Email Purge**

On December 18, 2019, Richard Strickland, a Wellpath IT Security Manager, emailed several other Wellpath employees to say that Wellpath was not actively removing the email mailboxes of employees who had been terminated for more than one year. Devlin Decl. Ex. 36. Strickland proposed automating the process. *Id.* Joel Jensen, Wellpath's Vice President for Information Technology replied that "there is a lot of scrutiny on email retention" and that the procedure should clearly state that mailboxes on legal hold would not be deleted. *Id.* In response, Wellpath IT staff created an "Email Purge Process." Devlin Decl. Ex. 37

On April 6, 2020, Wellpath IT staff reported that the "first run of the email purge script was run successfully today" and that over 5,000 emails were deleted. Devlin Decl. Ex. 38. Among the email mailboxes deleted in this purge was the mailbox for Sauerbry, a named Defendant. Wellpath deleted 0.03 gigabytes of data from her mailbox.

### D. *Moreno* **and Pausing the Email Purge**

In March 2020, the plaintiff in the *Estate of Moreno* case moved for default sanctions against Wellpath based on Wellpath's failure to preserve emails subject to discovery. The emails were destroyed in Wellpath's purges of its employee emails. On June 1, 2020, the district court granted the motion and entered a default judgment as a sanction for Wellpath's discovery violations.

On August 15, 2020, in response to the *Estate of Moreno* ruling, David Perry sent an email to Robert Martin saying:

> Bob, in light of this issue, which has the potential to be very negative for some of our litigated claims, I am asking you to immediately suspend our electronic document retention policy. No emails should be deleted, automatically or otherwise, until we get this properly assessed and worked out. Please confirm back to me that this suspension can be, and has been, implemented. Sorry for the inconvenience but we simply have to do this.

Devlin Dec. Ex. 42.

In response, Wellpath's IT department placed all email mailboxes on a litigation hold, halting any further purges of the emails.  Devlin Decl. Ex. 43.  By this time, however, Wellpath had already entirely purged the email inbox for Sauerbry and deleted all of the emails older than August 2019 for the Wellpath employees connected to the Coos County Jail.  No litigation hold had been placed on those mailboxes until the company-wide halt of email purges in August 2020.

### E.  Discovery in this Case

On July 30, 2020, Plaintiff served his first Request for Production of Documents ("RFP") seeking, among other things, emails and text messages relevant to their claims.  Devlin Decl. Ex. 45.  The Wellpath Defendants responded on September 30, 2020.  Devlin Decl. Ex. 46.

On July 2, 2021, Plaintiff's counsel sent a letter to the Wellpath Defendant's counsel concerning discovery.  The letter observed that Plaintiff has not received any emails, text messages, or other similar items in response to discovery requests and sought an explanation from Wellpath Defendants.  Devlin Decl. Ex. 47, at 7.   The Wellpath Defendants responded to the letter on August 12, 2021 without addressing the issue of emails.  Devlin Decl. Ex. 48.  The Wellpath Defendants did not disclose that the emails had been permanently deleted the previous year.

In September 2021, the parties exchanged emails discussing proposed email search terms.  Devlin Decl. Exs. 49, 51.  The Wellpath Defendants objected to the proposed email search terms on the basis of cost and time, but did not disclose that the emails had been permanently deleted.

The parties exchanged emails again in November 2021 where they discussed email search terms for electronic discovery.  Devlin Decl. Ex. 52.  On November 24, 2021, the

Wellpath Defendants responded that Plaintiff's proposed search terms were overbroad and likely to be cost-prohibitive but did not disclose that the emails had been destroyed. Devlin Decl. Ex. 53.

In December 2021, the parties sought the assistance of the Court in resolving the email search term issue and the Court directed that the parties summarize their dispute. The Court set a hearing for January 27, 2022. On January 24, 2022, counsel for the Wellpath Defendants sent an email to the Court setting out its objections to Plaintiff's proposed email search terms. Devlin Decl. Ex. 57. The Wellpath Defendants' position, at that time, was that the proposed search terms were overbroad and burdensome. No mention was made of the fact that emails had been deleted.

The Court held a status conference on the issue on January 27, 2022. The Court observed that there were relatively few Wellpath employees attached to the Coos County Jail and so a search of those email mailboxes would not be overly burdensome. Devlin Decl. Ex. 58, at 24. Counsel for the Wellpath Defendants represented to the Court that they would pass the matter on to their IT department and that they "will go through names, we will look at the e-mail files for search terms." *Id.* at 27-28. No mention was made of the fact that those emails had been deleted.

The parties continued to discuss the email issue following the hearing and, on February 8, 2022, counsel for the Wellpath Defendants sent an email to Plaintiff's counsel telling them that the email searches would be time consuming and expensive. Devlin Decl. Ex. 60. On February 15, 2022, counsel for the Wellpath Defendants told Plaintiff's counsel that he was "checking with my client" about producing emails. Devlin Decl. Ex. 62. Again, no mention was made of the fact that those emails had been deleted.

On March 8, 2022, counsel for the Wellpath Defendants emailed Plaintiff's counsel that Wellpath had told him that it could not do a company-wide email search and would have to search each employee's individual mailbox.  Counsel for the Wellpath Defendants again complained of the cost and difficulty involved but did not tell Plaintiff's counsel that the emails had been deleted nearly two years earlier.  Devlin Decl. Ex. 65.

On March 12, 2022, Plaintiff's counsel agreed to limit the search to the emails of those who worked at the jail and their supervisors.  Devlin Decl. Ex. 66.

On March 30, 2022, Plaintiff's counsel informed the Court that Plaintiff and the Wellpath Defendants continued to dispute the email search term issue and requested a hearing.  Devlin Decl. Ex. 67.

The Court held a status conference on April 11, 2022.  At that conference, counsel for the Wellpath Defendants told the Court that the email search would have to be done mailbox by mailbox, but that counsel had "emails at the local level" and would review them and send them to Plaintiff's counsel that week.  Devlin Decl. Ex. 68, at 7.  Counsel did not tell the Court or the other parties that the emails had been permanently deleted.

On April 14, 2022, counsel for the Wellpath Defendants produced the "results of searches of individual email boxes using the designated search terms."  Devlin Decl. Ex. 69.  No mention was made of the deleted emails.  Plaintiff's counsel reviewed the production and found that there were no emails from Sauerbry and few emails from Weaver.

The Court held another status conference on May 26, 2022, at which Plaintiff's counsel reported that emails had been produced by Wellpath and that they were awaiting emails from the County Defendants.  Devlin Decl. Ex. 70.

On June 10, 2022, the County Defendants produced emails to Plaintiff in discovery. Devlin Decl. Ex. 71.  In reviewing the emails, Plaintiff's counsel discovered emails from Weaver which had not been produced by the Wellpath Defendants.  Plaintiff's counsel contacted the Wellpath Defendants' counsel to inquire about the discrepancy and about the large number of emails produced by the County Defendants relative to the small number produced by the Wellpath Defendants.  Devlin Decl. Ex. 73.

On July 18, 2022, counsel for the Wellpath Defendants responded to tell Plaintiff's counsel that "[a] proper search was conducted," and that "Wellpath's email retention policy is one year."  Devlin Decl. Ex. 75.  This was the first time the Wellpath Defendants had mentioned the retention policy despite many months of back-and-forth discussion of email discovery among the parties and multiple conferences on the subject with the Court.

The Court held a status conference on the matter on July 29, 2022.  Devlin Decl. Ex. 76. At that conference, Plaintiff's counsel informed the Court that, despite the tort notice, the emails had not been preserved.  The Court expressed astonishment and displeasure with the fact that the emails had been deleted and with the Wellpath Defendants' failure to advise the Court of that fact during the months in which the parties and the Court had been discussing the parameters of the email search protocol.  The Court ordered the Wellpath Defendants to bring a proposal for the recovery of the deleted emails at the Wellpath Defendants' expense.

On August 12, 2022, the Wellpath Defendants submitted their discovery proposal. Devlin Decl. Ex. 77.  In that proposal, the Wellpath Defendants stated that their search was confined to email mailboxes of employees from 2014 through 2018.  A third party was to be retained to take over the discovery process.  However, no mention was made of the purge policy

or the fact that, in its internal emails, the Wellpath Defendants had discussed the fact that deleted emails would not be recoverable.

The Court held another status conference on September 15, 2022.  Devlin Decl. Ex. 78. The Wellpath Defendants called an IT consultant to provide testimony during that hearing. Plaintiff's counsel asked the consultant "[H]ow do we determine if certain custodians' emails have been purged and on what date?  So, in other words, the way I'm understanding it is, you're going to start an extensive process to preserve and produce those documents and/or emails that are there.  How do we find out what's not there and the dates on which they were purged?"  *Id.* at 10-11.   The consultant replied that would be "a complicated process" and testified that a forensic analysis would be expensive and burdensome on the Wellpath Defendants.  Plaintiff's counsel raised the issue of the *Estate of Moreno* case and asked whether the emails Plaintiff sought might have been destroyed in the same nationwide purge.  The Court set a status conference on October 6, 2022 to give the parties time to determine if the emails in this case had been subject to the nationwide purge.

On September 30, 2022, Plaintiff's counsel emailed the Wellpath Defendants' counsel to clarify that the IT consultant would be providing an update on efforts to recover any deleted emails and whether Sauerbry's emails had been deleted.  Devlin Decl. Ex. 79.

On the day of the hearing, the Wellpath Defendants submitted a Notice and Affidavit by IT consultant Sameer Pansare.  In the Notice, the Wellpath Defendants asked for more time to examine the still-existing email accounts to determine the contents of the emails and how the custodians used their email.  Devlin Decl. Ex. 81.  The Pansare Affidavit stated that the cost of a forensic analysis would be nearly $500,000 and that "there is an extremely low likelihood of successful retrieval of mailboxes that were not retained, including that of Ms. Sauerbry."  *Id.* at

16.  Wellpath's internal emails, discussed above, reveal that Wellpath was aware that deleted email mailboxes were not recoverable before it began purging them.

On October 6, 2022, the Court held another status conference.  At the hearing, the Wellpath Defendants admitted that Sauerbry's email mailbox could not be found.  Devlin Decl. Ex. 82, at 10.

In October 2022, the Wellpath Defendants' current counsel replaced their prior counsel in this case.  The Wellpath Defendants moved for extension of discovery deadlines and admitted that, after more than two years of discovery, there were "approximately 60 banker's boxes in the Coos County jail," that had not been fully reviewed.  Devlin Decl. Ex. 83, at 3.

On November 17, 2022, Plaintiff's counsel had a conference call with the Wellpath Defendants' counsel, at which the Wellpath Defendants' counsel admitted that Wellpath had purged Sauerbry's emails after she left Wellpath's employ in July 2018.  The Wellpath Defendants' counsel also acknowledged that, although Wellpath had received Plaintiff's tort claim notice, no litigation hold had been placed on Sauerbry's emails.

On November 30, 2022, Plaintiff's counsel emailed the Wellpath Defendants' counsel to ask if a litigation hold had been placed on Weaver's emails.  The Wellpath Defendants' counsel responded that he believed a hold had been placed but was "working through the dates and details."  Devlin Decl. Ex. 84.

On December 6, 2022, the Wellpath Defendants filed the Corrected Supplemental Affidavit of Sameer Pansare, in which Pansare affirmed:

> Patricia Sauerbry [was] terminated on July 17, 2018.  Wellpath's new retention policy providing a 12-month retention was implemented between February through April, 2019.  Consistent with the new retention policy, as of July 18, 2019, no further emails for Patricia Sauerbry were retained.  Ms. Sauerbry's mailbox was not migrated to a 2016 server, as it would have been empty due to prior records retention policies at the time of migration.

Devlin Decl. Ex. 85, at 4.

       This Corrected Supplemental Affidavit did not disclose that Sauerbry's email mailbox had been deleted entirely in the second email purge, which took place after the filing of the Answer in this case. Nor did it mention that the emails of the other custodians from before August 2019 had also been deleted.

       The Court held another status conference on December 6, 2022. At that hearing, counsel for the Wellpath Defendants confirmed that Weaver's emails had not been covered by a litigation hold as of 2020. Devlin Decl. Ex. 86, at 8. Plaintiff sought permission to conduct additional discovery on the issue of the litigation holds. *Id.* at 11. A further status conference was held on January 23, 2022. Devlin Decl. Ex. 87.

       On February 8, 2023, the Wellpath Defendants responded to discovery requests from Plaintiff. Devlin Decl. Ex. 88. In those responses, Plaintiff learned or confirmed: (1) in March 2018, Wellpath received a preservation notice from Plaintiff's counsel for materials related to the death of Mr. Stewart; (2) in May 2018, the Wellpath Defendants received the tort claim notice related to the death of Mr. Stewart; (3) that no litigation holds were placed in connection to this case at that time; and (4) that emails for Weaver, Sauerbry, and other custodians Dr. Vivek Shah, Dr. Paul Bilder, and Clint Banning were deleted. These facts were known to the Wellpath Defendants during the ongoing discovery discussions with Plaintiff and during the months of status conferences with the Court where issues of email discovery were discussed.

       This Motion for Sanctions followed.

## DISCUSSION

### I.    Sanctions Under Rule 37

Plaintiff seeks a default sanction against the Wellpath Defendants for failure to preserve electronically stored information ("ESI") pursuant to Federal Rule of Civil Procedure 37(e) which provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

"If the court finds that a party acted with the intent to destroy ESI, it need not find that the party requesting sanctions was prejudiced by the destruction." *Estate of Moreno v. Correctional Healthcare Companies, Inc.*, NO: 4:18-CV-5171-RMP, 2020 WL 5740265, at *5 (E.D. Wash. June 1, 2020) (citation omitted). "[D]istrict courts in the Ninth Circuit have found that a party's conduct satisfies Rule 37(c)(2)'s intent requirement when the evidence shows, or it is reasonable to infer that the party purposefully destroyed evidence to avoid its litigation obligation." *Id.* at *6 (internal quotation marks and citation omitted, alteration normalized).

Here, there can be no real question that the ESI at issue should have been preserved in the anticipation of litigation. At the time of the first purge of emails in March 2019, Wellpath had

received an evidence preservation letter, a tort claim notice, and a letter from Plaintiff's counsel concerning Mr. Stewart's death. The second purge, which occurred in April 2020, is even more egregious in that it occurred after the Wellpath Defendants had filed their Answer and it deleted the email mailbox of a named party.

The Court is similarly satisfied that the Wellpath Defendants failed to take reasonable steps to preserve the email mailboxes at issue. The Wellpath Defendants admitted that they failed to place litigation holds on any of the deleted email mailboxes and Wellpath itself has presented evidence that the recovery or restoration of the deleted mailboxes and emails is impossible. The Wellpath Defendants argue that there are alternative methods of learning the contents of the mailboxes, such as deposing the witnesses, but Plaintiff has presented evidence that the Wellpath Defendants have already given contradictory information about the use of emails by the relevant custodians. For example, the Wellpath Defendants represented that Weaver only occasionally sent emails and "sending emails was not a standard practice." Devlin Decl. Ex. 81, at 3. The County Defendants have, however, produced emails in which Weaver communicates clinical and administrative information to others at the jail. Devlin Decl. Ex. 94. And when the email purge policy was announced, Weaver expressed concern that she would not have enough room to store emails for a year. Devlin Decl. Ex. 19, at 1. This is hardly consistent with only occasional use of Wellpath's email systems. In addition, given the amount of time that has passed, the Court does not believe that deposition testimony would be a substitute for access to the documents themselves.

Turing to the question of intent, the Court notes the similarities between the facts of this case and the facts of *Estate of Moreno*, 2020 WL 5740265 (E.D. Wash. June 1, 2020). There, as here, Wellpath (or its corporate predecessor) provided medical services to a jail under contract

and an inmate died while in custody. *Id.* at *1-2. As here, emails relevant to the case were purged by the defendants after a document preservation request was sent and after discovery requests had been served on the defendants. *Id.* at *3. The defendants concealed this fact through early discovery, resulting in motions to compel. *Id.*

In *Estate of Moreno*, the district court found that the destruction of the ESI had been intentional. *Estate of Moreno*, 2020 WL 5740265, at *6-7. In support of that conclusion, the court noted the timing of the destruction, which occurred after the preservation request and discovery requests. The court also noted testimony by Wellpath corporate officers that the decision to implement the email purge policy was motivated "in part, to avoid the discovery of bad emails in litigation." *Id.* at *7. The court also rejected an argument that, because the purge of emails was nationwide, it could not demonstrate an intent to deprive a specific plaintiff of discovery. *Id.* at *7 ("The Court rejects the concept that Defendants are immune from dispositive sanctions under Rule 37(e)(2) because they intended to destroy harmful ESI in all of their cases, rather than the harmful destruction that they caused in this particular case.").

The same general facts exist in this case. The first purge of the emails occurred after the Wellpath Defendants received an evidence preservation notice and a tort claim notice from Plaintiff. Because the emails in this case were lost a result of the same purge that destroyed the ESI in *Estate of Moreno*, the deposition testimony concerning the desire to get rid of "bad" emails to avoid discovery applies with equal force here. Indeed, the facts of this case are *more* egregious than those of *Estate of Moreno* because the Wellpath Defendants initiated a second purge of emails which destroyed the mailbox of Sauerbry, a named Defendant, after the Wellpath Defendants had filed an Answer and asserted affirmative defenses. Given the timing,

Defendants cannot reasonably claim that they did not know that Sauerbry's email mailbox was not relevant to the case.

In addition, the Wellpath Defendants concealed the fact of the purges from both Plaintiff and this Court for months, despite multiple conferences with the Court about the scope and conduct of electronic discovery.  This deceptive conduct strongly suggests that the Wellpath Defendants hoped that their destruction of ESI would not be discovered, which is in turn probative of the Wellpath Defendants' intent.  Had the destruction of the ESI been a genuine accident that the Wellpath Defendants promptly disclosed to Plaintiff, this motion might well not be before the Court.

As in *Estate of Moreno*, the Court concludes that the Wellpath Defendants acted with intent pursuant to Rule 37(e).  The Court may, therefore, issue terminating sanctions under that Rule.

## II.    Default Sanction

Terminating sanctions are necessarily severe and so the Ninth Circuit has established factors that a court must weight before imposing such a harsh penalty: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits.  *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).[1]  Courts should not apply these factors mechanically, but rather use the factors to supply a framework to guide the

---

[1] Although *Leon* was decided under a court's inherent power to levy sanctions in response to abusive litigation practices, the *Leon* factors remain a consideration when considering sanctions under Rule 37.  *See, e.g., Estate of Moreno v. Correctional Healthcare Companies, Inc.*, NO. 4:18-CV-5171-RMP, 2020 WL 5740265, at *7-10 (E.D. Wash. June 1, 2020) (applying the *Leon* factors in a motion for sanctions under Rule 37(e)); *Facebook, Inc. v. OnlineNIC, Inc.*, Case No. 19-cv-07071-SI (SVK), 2022 WL 2289067, at *8-12 (N.D. Cal. Mar. 28, 2022) (applying the *Leon* factors to a motion for terminating sanctions under Rule 37(b)(2)(A)(vi)).

court's decision. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007).

The Court considers the first two *Leon* factors, which address the public interest in expeditious resolution of litigation and the Court's need to manage its docket, together. Here, this case has been significantly delayed by the Wellpath Defendants' misconduct. Plaintiff began seeking the deleted emails years before the belated revelation that they had been destroyed. The Court held numerous status conferences at which the contours of email discovery were discussed at length and in detail and the Wellpath Defendants made no mention of the fact that the emails in question had been destroyed. This misconduct has substantially slowed the progress of the case and necessitated multiple hearings and this very motion. The Court concludes that the first two factors weigh in favor of a terminating sanction.

The remaining factors are interlinked because the risk of prejudice to Plaintiff, the public policy favoring resolution of cases on the merits, and the availability of less drastic sanctions "all require the Court to consider whether a legitimate trial on the merits is possible, considering Defendants' widespread spoliation." *Estate of Moreno*, 2020 WL 5740265, at *8. Although the court is not required to make explicit findings as to each factor, a finding of willfulness, fault, or bad faith is required for dismissal to be proper. *Leon*, 464 F.3d at 958. The "most critical factor is not merely delay or docket management concerns, but truth," and the court's primary concern should be "whether the discovery violations threaten to interfere with the rightful decision of the case." *Conn. Gen. Life Ins. Co.*, 482 F.3d at 1097 (internal quotation marks and citation omitted). "Due process concerns further require that there exist a relationship between the sanctioned parties misconduct and the matters in controversy such that the transgress threatens to interfere with the rightful decision of the case." *Anheuser-Busch, Inc. v. Natural Beverage Dist.*,

69 F.3d 337, 348 (9th Cir. 1995) (internal quotation marks and citation omitted, alterations normalized).

Here, as discussed above, the Wellpath Defendants have destroyed most, or in some cases all, of the emails of the relevant custodians. The contents of these emails cannot be recovered and Plaintiff cannot acquire the contents through other avenues of discovery. The contents of internal communications between the Wellpath employees at the facility where Rocky Stewart died would be extremely important to Plaintiff's case, as evidenced by the fact that Plaintiff sought those emails early in the discovery process and brought the matter to the Court's attention when the emails were not forthcoming, and the contents of the emails can now only be guessed. The Court concludes that the third *Leon* factor weighs heavily in Plaintiff's favor.

Ordinarily, the fourth *Leon* factor will weigh against the imposition of a terminating sanction. In *Estate of Moreno*, court found that the defendants "destruction of countless email communications between its employees in this case threatens to interfere with the rightful decision of the case" to a such a degree that the fourth factor did not weigh against a terminating sanction. *Estate of Moreno*, 2020 WL 5740265, at *9. The Court finds that the Wellpath Defendants' conduct has caused a similar risk in this case and so concludes that the fourth *Leon* factor does not weigh against the requested sanction.

With respect to lesser sanctions, the Wellpath Defendants urge the Court to consider alternatives to default, such as monetary penalties. The Court is not convinced, however, that any lesser sanction would be effective. The Court fails to see how a curative jury instruction, for example, might remedy the harm done by the Wellpath Defendants' spoliation of ESI. In addition, courts may refuse to impose a less severe sanction if the court "anticipates continued deceptive misconduct." *Conn. Gen. Life Ins. Co.*, 482 F.3d at 1097. Here, the Wellpath

Defendants misled both Plaintiff and the Court concerning the availability of the deleted emails for months and the Court has no reason to believe that a lesser sanction will prevent further deceptive representations by the Wellpath Defendants.  Indeed, the Court notes that the Wellpath Defendants deceptive conduct in this case continued unabated despite the imposition of a default sanction against them in *Estate of Moreno* for essentially the same misconduct.  As a consequence, the Court concludes that the fifth *Leon* factor weighs in favor of a terminating sanction.

In sum, upon consideration of Rule 37(e)(2) and the Ninth Circuit's *Leon* factors, the Court concludes that dispositive sanctions are warranted as to the Wellpath Defendants in this case.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Sanctions, ECF No. 96, is GRANTED and a dispositive sanction is entered against the Wellpath Defendants.  Judgment is for Plaintiff as to liability on all claims against the Wellpath Defendants.   This matter will proceed to trial against the Wellpath Defendants to establish damages.

It is so ORDERED and DATED this ___14th___ day of June 2023.


 /s/Ann Aiken_____
ANN AIKEN
United States District Judge